[No. 2919–3.   Division Three.   June 7, 1979.]

LAWRENCE MITHEN, *Appellant,* v. BOARD OF TRUSTEES OF CENTRAL WASHINGTON STATE COLLEGE, ET AL, *Respondents.*

---

*C. Kenneth Grosse* and *Keller, Rohrback, Waldo & Hiscock,* for appellant.

*Slade Gorton, Attorney General,* and *Owen F. Clarke, Jr., Assistant,* for respondents.

MUNSON, J.—Plaintiff appeals the granting of the defendants' motion for summary judgment; the trial court held there was no genuine issue as to any material fact and that the defendants were entitled to judgment as a matter of law; we reverse.

The defendants' motion for summary judgment was based on three grounds: (1) plaintiff was ineligible to accept employment with Central Washington State College (CWSC) by virtue of his immigration status at the time he

signed an employment agreement; therefore, it was an illegal contract and void; (2) there was no contract of employment but merely a solicitation of services by CWSC until such time as the board of trustees employed plaintiff; (3) the board did not approve plaintiff's appointment to the college faculty; therefore, the promise of employment was illusory.

Dr. Mithen was an Australian citizen who became a citizen of Canada in 1976. He had attended the University of Oregon, obtaining his Master's degree in 1971 and his Ph. D. in 1975. Negotiations for employment with CWSC began subsequent to obtaining his doctorate. The position for which he was applying was assistant professor of education supervising student teachers in Yakima. Dr. Mithen's deposition[1] evidenced that telephone calls the first days of August notified Dr. Carlton, the head of the education department, that Dr. Mithen was a foreign student and needed an alien employment certificate, which the college needed to endorse. Dr. Mithen was told there was no need to worry about his employment certificate and the endorsement of the college. By letter of August 6, 1975, Dr. Mithen was offered an appointment for the academic year of 1975–76, which included supervision of students enrolled in a specific class preceding the fall quarter, for which he would be paid 1/9 of his basic salary. The letter was signed by Edward J. Harrington, Vice President for Academic Affairs,

---

[1]This case was originally appealed to the Supreme Court which transferred it to this division. By letter of March 13, 1978, the Kittitas County Clerk advised the clerk of the Supreme Court that she was forwarding by enclosure the "unopen[ed] deposition of Lawrence Sidney Mithen." When the case was transferred to this court on May 15, 1978, the deposition was in the same unopened form. The defendants' motion for summary judgment stated that it was "supported by the deposition testimony of the plaintiff" as well as by Dean Erickson's affidavit and memorandum of facts and authority; thus the deposition was before the trial court at the time it ruled. This court received a stipulated order signed by the hearing judge dated April 21, 1978, opening and publishing the deposition; since both parties have made extensive references to the deposition in their briefs before this court, we have read and considered that deposition.

928

and by Dean James Erickson, School of Professional Studies. The letter also noted:

This appointment is contingent upon approval by the Board of Trustees and receipt of satisfactory transcripts from all institutions attended. Please arrange to have official transcripts sent directly from the institutions to Dean Erickson.

Dr. Mithen signed the letter August 12 and returned it with his transcripts to the dean of professional studies, where it was received August 13, 1975. At about the same time, he applied to the United States Immigration and Naturalization Service for employment as an alien[2] to receive certification; the application was sent to the college which forwarded it to the proper agency. Dr. Mithen also applied as a nonimmigrant student for an extension of stay and permission to accept employment for practical training.[3]

---

[2] 8 U.S.C.A. § 1182(a)(14) (1970):

"(a) Except as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission to the United States:

". . .

"(14) Aliens seeking to enter the United States, for the purpose of performing skilled . . . labor, unless the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that (A) there are not sufficient workers in the United States who are able, willing, qualified, and available at the time of application for a visa and admission to the United States and at the place where the alien is destined to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed."

[3] 8 C.F.R. § 214.2(g)(6) (1977):

". . . If a student requests permission to accept or continue employment in order to obtain practical training, an authorized school official must certify that the employment is recommended for that purpose and will provide the student with practical training in his field of study and, upon information and belief, would not be available to the student in the country of his foreign residence. Permission to accept or continue temporary employment to obtain practical training may be granted in increments of not more than six months each for a maximum of not more than 18 months in the aggregate. However, when the course of study completed by the alien in this country was of less than 18 months duration, permission may be granted to engage in employment for practical training for an aggregate number of months not exceeding the length of that course of study . . . The application for the first period of practical training shall be submitted to the

The permit for practical training was approved by the University of Oregon and subsequent extensions would be, pursuant to regulations, approved by CWSC.

Dr. Mithen moved his wife and seven children to Yakima and undertook his prequarter activities supervising students. He and his family lived in a motel while they were seeking permanent housing; within a few weeks he entered into an earnest money agreement for the purchase of a residence and had paid for title insurance, paying out a total of $647. Not having heard on his application for alien employment, he made further inquiry of CWSC as to the forwarding of his application and kept in communication with CWSC in that regard. On Thursday preceding the beginning of the fall quarter, Dr. Mithen received word he should contact Dean Erickson of the school of professional studies. They made contact about 9 p.m.; Dean Erickson advised that the Ellensburg Office of Employment Security had received notification from the Department of Labor that his application for alien employment was not approved because:

> Available job market information will not warrant a certification of unavailability of workers in the U.S. who are able, willing, and qualified for employment in this occupation.

This information had been telephoned to the college. The college subsequently received on September 22 written confirmation of that declination. Dean Erickson informed Dr. Mithen that unless he had evidence of employability by noon the following day, Friday, they could not hire him and he should not report to work the following Monday, the beginning of the fall quarter.

---

office of the Service having jurisdiction over the school recommending practical training. Subsequent applications to continue employment for practical training must contain the recommendation of that school, shall be submitted to the office of the Service having jurisdiction over the actual place of employment, and shall be supported by a letter from the applicant's employer stating the occupation in which the applicant is employed and describing the duties he is performing."

Dr. Mithen's deposition states he told Dean Erickson the shortness of the period was almost prohibitive. He had appointments Friday with various principals of schools in the Yakima area pursuant to his job responsibilities and he would have to contact the immigration office in Portland, Oregon. Notwithstanding, the Dean stood fast. Dr. Mithen made what phone calls he could that night and the following morning and rearranged his schedule. He was advised by the Portland immigration office that it was open until 4:30; but by the time he completed his job responsibilities and got his family transported from Yakima to Portland, arriving about 4:15, the immigration office was closed. Early Monday morning he made the necessary contact with the University of Oregon and the Portland immigration office, and was orally granted an authorization for practical training from September 1975 to February 1976. Dr. Mithen further testified he called Dr. Carlton at the college, giving him the name and telephone number of the person to contact at the Portland immigration office to verify this information.

Dr. Mithen was not given further duties at the college and by letter dated October 2, 1975, from Dean Erickson was advised that "circumstances are such that we will not be able to offer you employment for the present school year." The school did pay him for the 2 weeks he had worked in Yakima. Also, by letter of October 2, 1975, Dean Erickson advised Dr. Edward J. Harrington, vice president of academic affairs, CWSC, of his version of the relation between the college and Dr. Mithen and the problem of his employability because he was an alien. The letter further stated:

> Enrollments in the Education Department were such that I informed Dr. Carlton that we would not be able to fill that position with Mithen or anyone else, and that Mithen's immigration status could affect only possible payment for September Experience supervision. . . .
> I have chosen not to bring Mithen to the Board for approval and would recommend disapproval to the Board in light of enrollment levels in the Department.

The incident of Dr. Mithen's employment was never presented to the board. Dr. Mithen was unemployed until August of 1976 when he accepted an educational position in Campbell River, British Columbia. This action for breach of contract was instituted in August 1976. His deposition was taken April 22, 1977, and the transcript thereof filed June 1, 1977; defendants' motion for summary judgment was filed in September 1977 and granted October 10, 1977; plaintiff appeals.

During the pertinent time period, Laws of 1969, 1st Ex. Sess., ch. 223, § 28B.40.120, p. 2024 (formerly RCW 28B-.40.120) provided:

> In addition to any other powers and duties prescribed by law, each board of trustees of the respective state colleges: [including CWSC]
> (1) Shall have full control of the state college and its property of various kinds.
> (2) Shall employ . . . members of the faculty, and other employees of the institution, who, except as otherwise provided by law, shall hold their positions, until discharged therefrom by the board for good and lawful reason.

RCW 28B.10.528 states:

> The governing boards of institutions of higher education shall have power, when exercised by resolution, to delegate to the president or his designee, of their respective university or college, any of the powers and duties vested in or imposed upon such governing board by law. Delegated powers and duties may be exercised in the name of the respective governing boards.

The college admits that the letter of August 6, 1975, offering employment to Dr. Mithen, sent by Vice President Harrington and Dean Erickson, was within their designated powers and that they had authority to send the letter. As the letter indicates, that appointment was contingent upon approval of the board of trustees. As established by answers to Dr. Mithen's interrogatories, one of the duties of Dr. Harrington as vice president of academic affairs is to supervise "the procedures for recruitment and appointment

of new faculty," and one of the duties of Dr. Erickson as dean of the school of professional studies was the responsibility for leadership in professional program planning, initiation and development; but neither had authority to make "firm offers for employment" at CWSC. Obviously, faculty appointments were subject to the approval of the board of trustees; however, by admission "an offer of appointment" may be tendered by standard form letter "sent to the prospective appointee which is cosigned by the dean and the Vice President for Academic Affairs. The letter states that the appointment is contingent upon approval by the Board of Trustees and may state other contingencies as well."

█ The issue resolves itself into what the nature of the contractual relationship was between Dr. Mithen and CWSC when the faculty or administration of the college did not see fit to present their offer of employment to the board of trustees. Contrary to the position of the college, we do not find this to be an illusory and unenforceable promise such as has been found in *Sandeman v. Sayres,* 50 Wn.2d 539, 314 P.2d 428 (1957); *Spooner v. Reserve Life Ins. Co.,* 47 Wn.2d 454, 287 P.2d 735 (1955); *Interchange Assocs. v. Interchange, Inc.,* 16 Wn. App. 359, 557 P.2d 357 (1976). An illusory promise is one which according to its terms makes performance optional with the promisor, Restatement of Contracts § 2(b) (1932); or as stated in 1 S. Williston, *Contracts* § 105, at 418 (3d ed. 1957): "An agreement wherein one party reserves the right to cancel at his pleasure cannot create a contract."

█ The situation here is different. Obviously, had Dr. Mithen been granted certification for alien employment or produced such evidence by noon Friday following his telephone conversation with Dr. Erickson, this issue would never have arisen. The board of trustees met on September 26, the first Friday after the beginning of fall quarter. One of the items on its agenda was new appointments to the faculty. Had the question of Dr. Mithen's alien status not arisen, the inference from Dr. Erickson's telephone call is

that the contract would have been submitted for the board's approval as a matter of course, and in all likelihood been approved. The fact that the administration chose not to submit Dr. Mithen's contract to the board, including his immigration problem, at which time the board could have declined approval, is of no consequence now. It is apparent that the administration had authority to screen applicants for employment and make offers of employment. This was done by telephone conference before the offer was submitted. The offer accepted and returned, subject to approval of the board, has never been before the board for approval or disapproval. We believe there was a valid existing relationship between these parties subject to a condition subsequent, *i.e.,* submission to the board for its approval. Dr. Mithen was employed and received payment for the services he did render. There was never a contingency to his acceptance that he have the proper immigration papers prior to employment, although the college was aware, for purposes of this motion, that he did have to get proper authority. Whether the time from 9 p.m. Thursday night to noon of the following day, Friday, is a reasonable time is highly suspect, particularly when his alien status was never submitted to the board of trustees.

We agree with the college that the faculty code of personnel policy and procedure was inapplicable because there had not been approval of Dr. Mithen's employment contract, and hence the discharge provisions were not applicable. Here, at the request of the college and pursuant to the offer of employment, Dr. Mithen accepted in writing, moved to the locale of the employment and undertook the duties pursuant to his contract. This is part performance of the contract, noted in 1 A. Corbin, *Corbin on Contracts* § 83, at 357 (1963), as follows:

> If the offeror proposes an exchange of conditional promises, the offeree must assent unconditionally to that exact exchange. Thus, where A offers to buy a patent at a named price, on condition that X shall express approval of the patent, and B promises to sell it at that price and

subject to the same condition, they have made a valid and irrevocable contract. This is so, even though if X fails to approve neither A nor B will be under any duty of paying or transferring. The failure of X to approve shows no defect in the expressions of assent—the offer and the acceptance. A and B were exactly agreed; and they exactly expressed their agreement. A gave his conditional promise to pay in exchange for B's promise to assign the patent subject to the very same condition. Both parties assented to the exchange of these very promises.

Defendants' assertion that the contract was illegal because of Dr. Mithen's immigration status is not well taken for the purposes of a summary judgment. There was evidence to the effect that Dr. Mithen's status had been approved by the Portland immigration authorities and that office had applied its approval retroactively to include the month of August when the contract was signed. Defendants' argument that Dr. Mithen had no possibility of performance of the contract because his visa was extended to February 25, 1976, only halfway through the school year, is equally without merit. The legality of the contract and the possibility of extension were questions of material fact. Dr. Mithen's testimony indicates such visas are routinely extended when there is a contract that exceeds 6 months. Further, in view of Dean Erickson's letter of October 2 to Dr. Harrington, there is a question of material fact as to whether Dr. Mithen's contract was not submitted to the board because of his immigration status or because of a drop in enrollment at the college. These considerations were never put before the board which had the sole authority to approve or disapprove the contract. Dr. Mithen was not subject to disavowal or revocation by a member of the administration without the authority of the board.

Finally, whether the contract was illegal as a matter of law at the time of the first meeting of the board of trustees subsequent to these events, i.e., September 26, has not been satisfactorily answered. The answers to interrogatories indicate that Dr. Carlton, head of the education department, received a phone call from Dr. Mithen regarding his

being granted a practical training certificate. Whether Dr. Carlton did call the immigration service at the number and contacted the person referred by Dr. Mithen is a question of material fact which relates to a genuine issue as to the knowledge of the college which should have been presented to the board of trustees.

Finding that as a matter of law this contract was neither illegal nor void and that there are genuine issues of material fact yet to be resolved, we reverse.

McINTURFF and ROE, JJ., concur.

Reconsideration denied July 3, 1979.