[Nos. 19717–7–I; 19724–0–I.   Division One.   January 25, 1988.]

RICHARD CARLSON, ET AL, *Appellants,* v. GIBRALTAR SAVINGS OF WASHINGTON, *Respondent.*

JAMES J. HAWKINS, *Appellant,* v. GIBRALTAR SAVINGS OF WASHINGTON, *Respondent.*

*David A. Leen* and *Leen & Moore,* for appellants Carlson.

*Charles B. Allen,* for appellant Hawkins.

*Jonathan B. Noll* and *Foster, Pepper & Riviera,* for respondent.

PEKELIS, J.—James J. Hawkins and Richard and Doris Carlson appeal from a summary judgment dismissing their action to invalidate a trustee's sale.

## I

David and Susan Hawkins are the officers and shareholders of Mad Dog Builders, Inc. Appellant James Hawkins is the son of David and Susan Hawkins. Appellants Richard and Doris Carlson are friends and neighbors of the Hawkins. In June 1980, the Carlsons loaned $15,000 to Mad Dog. The loan was secured by a deed of trust on property owned by Mad Dog at 714 Bellevue Avenue East in Seattle (the property). In order to develop condominium units on the property, Mad Dog borrowed $2,500,000 from Queen City Savings and Loan Association in August 1980. This loan, too, was secured by a deed of trust on the property. The Carlsons agreed to subordinate their interest to that of Queen City.

By late 1981, Mad Dog had encountered financial difficulties and was unable to pay its subcontractors. Several materialmen's liens were filed, among them that of Lone Star Industries, Inc.[1] On March 8, 1982, Mad Dog was notified that the Queen City loan was in default. On June 1, 1982, the trustee under the deed of trust sent Mad Dog a notice of foreclosure and notice of trustee's sale. The sale was scheduled to take place on September 10, 1982.

On July 28, 1982, Mad Dog and David and Susan Hawkins commenced a lawsuit against Queen City (the Queen City lawsuit), alleging that Queen City had breached its loan commitment. On September 10, 1982, the day of the scheduled sale, Mad Dog obtained a preliminary injunction preventing Queen City from foreclosing on the property for 6 months. On February 2, 1983, upon Queen City's motion to dissolve or modify the preliminary injunction, the court ordered that the injunction would terminate on March 10, 1983, and that the trustee's sale should take place on April 29, 1983.

---

[1]Lone Star, along with other lien claimants, filed a suit in 1982 which resulted in a judgment against Mad Dog.

On March 10, 1983, a second notice of trustee's sale was sent to Mad Dog, the Carlsons, and Lone Star, informing them that the sale would take place on April 29, 1983. However, Mad Dog obtained an automatic stay when it filed for bankruptcy in April 1983. As a result of the bankruptcy proceedings, the sale was postponed. On June 20, 1983, a bankruptcy judge dissolved the stay, thus permitting the sale to proceed.

Meanwhile, Mad Dog renewed its efforts in state court to have the sale enjoined. In April 1983, Mad Dog made a motion to extend the preliminary injunction, which was denied. On June 23, 1983, the day before the scheduled sale, Mad Dog brought a motion for reconsideration of this order. The motion was heard on June 24, 1983, and was denied at 1:50 p.m. The trustee's sale took place the same day at 2:15 p.m.,[2] at which time the property was sold to Queen City for $3,389,879.22, the amount of the debt secured by the deed of trust. The sale to Queen City extinguished Lone Star's and the Carlsons' interest in the property.

Mad Dog proceeded with its lawsuit against Queen City for breach of the loan agreement. In February 1984, the jury found, by special verdict, that Queen City had breached its agreement to loan Mad Dog sufficient funds to complete the condominium project and awarded Mad Dog and David and Susan Hawkins a total of $350,000 in damages for lost profits. Both sides appealed.

On May 25, 1984, Mad Dog and David and Susan Hawkins brought a second lawsuit against Queen City (the foreclosure lawsuit). This cause of action was based on Mad Dog's claim that the judgment in the earlier Queen City lawsuit had established that the foreclosure was improper. On this basis, they sought to set aside the foreclosure sale and quiet title to the property in Mad Dog. Shortly thereafter, Queen City went into receivership. Respondent

---

[2]The trustee states that the sale was continued until 2:15 in accordance with RCW 61.24.040(6). The appellants dispute this.

Gibraltar Savings of Washington acquired substantially all the assets and liabilities of Queen City, including the property, the judgment in the Queen City lawsuit, and the defense of the foreclosure lawsuit.

On October 5, 1984, Mad Dog and David and Susan Hawkins entered into a settlement agreement with Gibraltar. Gibraltar agreed to pay $498,000 to the Hawkins' and Mad Dog's creditors. In addition, Gibraltar granted Howell Street Associates, Inc., the Hawkins' designee, an option to purchase the property for $1,374,000 which was to be exercised on or before January 1, 1985. In exchange, the Hawkins agreed to release all claims against Gibraltar. Pursuant to the settlement agreement, the Queen City lawsuit and the foreclosure lawsuit were dismissed with prejudice. Although Gibraltar granted it an extension, Howell Street was unable to obtain the financing it needed and the option expired on March 7, 1985.[3]

In July 1986, Hawkins was advised that Gibraltar had entered into a contract to sell the property to 714 Joint Venture. On August 13, 1986, appellants Richard and Doris Carlson initiated this lawsuit against Gibraltar, seeking to invalidate the foreclosure sale and reinstate their interest in the property. On August 15, appellant James Hawkins, the son of David and Susan Hawkins, purchased Lone Star's lien. Three days later, on August 18, James Hawkins, as assignee of Lone Star's lien, brought a separate lawsuit against Gibraltar seeking to invalidate the foreclosure sale, reinstate the lien, and enjoin Gibraltar from selling the property.

The two suits were consolidated, and both sides moved for summary judgment. On November 14, 1986, the trial court granted Gibraltar's motion for summary judgment, finding that the trustee's sale complied with RCW 61.24 and the requirements of *Cox v. Helenius,* 103 Wn.2d 383,

---

[3]The failure of the option is the subject of another lawsuit brought by Mad Dog and the Hawkins against Gibraltar. In it, the plaintiffs allege that Gibraltar interfered with their attempts to obtain financing.

693 P.2d 683 (1985). After their motions for reconsideration were denied, James Hawkins and the Carlsons brought this appeal.

## II

On an appeal from an order of summary judgment, the reviewing court engages in the same inquiry as the trial court. *Wilson v. Steinbach,* 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). A motion for summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c). The court must consider all facts submitted and all reasonable inferences therefrom in the light most favorable to the nonmoving party, and the motion should be granted only if, from all the evidence, reasonable persons could reach but one conclusion. *Wilson,* 98 Wn.2d at 437.

The appellants contend that the trial court erred in determining that the trustee's sale complied with RCW 61.24. Specifically, they argue that the sale was improper because there was no default on the underlying obligation secured by the deed of trust, *see* RCW 61.24.030(3),[4] and because there was an action pending on the underlying obligation, *see* former RCW 61.24.030(4).[5] They also argue

---

[4]RCW 61.24.030(3) provides:

"Requisites to foreclosure. It shall be requisite, to foreclosure under this chapter:

" . . .

"(3) That a default has occurred in the obligation secured or a covenant of the grantor, which by the terms of the deed of trust makes operative the power to sell;"

[5]Former RCW 61.24.030(4) provided:

"Requisites to foreclosure. It shall be requisite, to foreclosure under this chapter:

" . . .

"(4) That no action is pending on an obligation secured by the deed of trust;"

that the sale was improperly rescheduled under RCW 61.24.130(3) after the termination of the preliminary injunction, and that Gibraltar exceeded the time provided for continuance of the sale under RCW 61.24.040(6). Finally, the appellants argue that on June 24, 1983, the sale was continued until 2:15 p.m. without the "public proclamation" required by RCW 61.24.040(6).

The trial court found, as Gibraltar contended, that the trustee's sale complied with all the requirements of RCW 61.24. In addition, Gibraltar argues on appeal, as it did at trial, that the suit is barred by laches. This court may affirm the trial court's judgment on any theory argued below. *Lew v. Seattle Sch. Dist. 1*, 47 Wn. App. 575, 579, 736 P.2d 690 (1987). While it was unnecessary for the trial court to reach the issue of laches, we take a different approach, decide that issue first, and hold that the suit is barred by laches. We emphasize, however, that we do so not because we have evaluated and rejected the trial court's rationale. Rather, we believe that where laches bars an action, logic and judicial economy dictate that the court avoid the substantive issues altogether.

### III

Laches is an implied waiver arising from knowledge of a given state of affairs and acquiescence in it. *Buell v. Bremerton*, 80 Wn.2d 518, 522, 495 P.2d 1358 (1972). The elements of laches are:

(1) knowledge or reasonable opportunity to discover on the part of a potential plaintiff that he has a cause of action against a defendant; (2) an unreasonable delay by the plaintiff in commencing that cause of action [and]; (3) damage to [the] defendant resulting from the unreasonable delay.

*Buell*, 80 Wn.2d at 522.

### A

The record shows that the appellants knew or should have known by early 1983 that they might have a cause of action against Queen City. Both the Carlsons and Lone

Star, James Hawkins' assignor, received notice of the trustee's sale in March 1983.[6] That notice contained the following paragraph, taken directly from former RCW 61.24-.040(1)(f):

Anyone having any objection to the sale on any grounds whatsoever will be afforded an opportunity to be heard as to those objections if they bring a lawsuit to restrain the sale pursuant to RCW 61.24.130. *Failure to bring such a lawsuit may result in a waiver of any proper grounds for invalidating the trustee's sale.*

(Italics ours.) Nevertheless, neither the Carlsons nor Lone Star brought suit to restrain the sale pursuant to former RCW 61.24.130.[7]

Moreover, both the Carlsons and James Hawkins knew of the alleged improprieties surrounding the foreclosure. It is not disputed that shortly after he received the first notice of foreclosure, Richard Carlson was told by David Hawkins that, in his opinion, the foreclosure was illegal. David Hawkins also communicated this belief to James Hawkins, his son. It is also uncontroverted that both Carlson and James Hawkins and were aware of the ongoing litigation between David Hawkins and Queen City. In fact, Carlson even assisted David Hawkins in the Queen City lawsuit.

B

Although they knew by March 1983 of a potential cause of action against Queen City, the appellants did not commence that cause of action until August 1986, more than 3 years after the trustee's sale. The reasonableness of their delay must be evaluated.in light of the basic objectives of

---

[6]The Carlsons received notice even earlier, in May 1982. It is unclear from the record whether Loan Star, too, received notice at that time.

[7]Former RCW 61.24.130(1) provides:

"Nothing contained in this chapter shall prejudice the right of the grantor, his successor in interest, or any person who has an interest in, lien, or claim of lien *against the* property or some part thereof, to restrain, on any proper ground, a trustee's sale".

the deed of trust act, one of which is to promote the stability of land titles. *Cox v. Helenius,* 103 Wn.2d 383, 387, 693 P.2d 683 (1985). It must also be evaluated in light of the explicit warning contained in the notice of foreclosure that "[f]ailure to bring . . . a lawsuit [to restrain the sale pursuant to RCW 61.24.130] may result in a waiver of any proper grounds for invalidating the trustee's sale." Former RCW 61.24.040(1)(f).

Richard Carlson states in his deposition that he first considered bringing suit against Gibraltar when David Hawkins told him that he, Hawkins, was precluded from doing so by the settlement agreement. This conversation apparently took place sometime after the failure of the option in early 1985. Carlson thereafter continued to delay because he was, as he stated in his deposition, "kind of waiting for David [Hawkins] to . . . assist in suggesting an appropriate attorney." David Hawkins, who agreed to pay Carlson's legal expenses, eventually found an "appropriate" attorney for him.[8]

The most charitable interpretation of these facts, which are uncontroverted, is that Carlson simply rested on his rights for more than 3 years because he assumed that David Hawkins would protect those rights for him. This is, in fact, the interpretation that Carlson urges upon us. He contends that it was reasonable for him to await the results of the foreclosure lawsuit and the Howell Street option before making any efforts of his own to protect his interest in the property. We find no merit in this argument. It is not reasonable for a potential plaintiff to delay in asserting his legal rights merely because he hopes or expects that someone else's lawsuit will, as an incidental matter, achieve the results he desires. It is even less reasonable to watch one's ally settle a lawsuit, wait out the option period, and then, determining that the settlement was not advantageous after

---

[8]The same attorney also represented Mad Dog, a nominal defendant in Carlson's suit.

all, reinstate litigation of the very matters previously settled. For this reason, and in light of former RCW 61.24-.040(1)(f) and the objectives of the deed of trust act, we consider Carlson's delay manifestly unreasonable.

James Hawkins' delay was no more reasonable than Carlson's. The record shows that after David Hawkins was precluded by the settlement from bringing suit against Gibraltar, he attempted to interest some of the junior lienholders in bringing such a suit. One of the junior lienholders, Lone Star, declined the invitation to bring suit but offered instead to sell its lien. James Hawkins purchased Lone Star's lien, and David Hawkins found an "appropriate" attorney for him, as he had for Carlson.[9] Thus, James Hawkins brought a cause of action knowing that it could properly have been commenced more than 3 years earlier. He presents no facts which would justify this delay, which we find, as a matter of law, to be unreasonable.

## C

Finally, Gibraltar has been damaged by the appellants' unreasonable delay. First, Gibraltar has been damaged by having to defend against a lawsuit which is essentially the same as the one it settled 2 years earlier. The principle allegations made by the appellants in this case are identical to those made by Mad Dog and David and Susan Hawkins in the foreclosure lawsuit. That suit was dismissed with prejudice after the plaintiffs entered into a settlement agreement with Gibraltar. Based on that agreement, Gibraltar could reasonably expect that it would not have to litigate the same claims brought nominally by others, but subsidized by David Hawkins and primarily for his benefit.

Second, the appellants assert that if the foreclosure sale is declared invalid, Mad Dog will regain title to the property and Gibraltar, having released all of its claims against Mad Dog pursuant to the settlement agreement, will not be reinstated as senior lienholder. Thus, according to the

---

[9]Interestingly enough, this attorney, like Carlson's, also represented Mad Dog, a nominal defendant in James Hawkins' suit.

appellants' theory, Mad Dog would take title free and clear of any claim by Gibraltar, and Gibraltar would have paid $498,000 to Mad Dog's creditors for nothing. Having made this assertion, the appellants should not be heard to assert that Gibraltar would not be damaged were we to permit the case to proceed.

Because laches bars this action, we affirm.

WEBSTER, J., concurs.

WILLIAMS, J., concurs in the result.