949 P.2d 1260 (1997)
133 Wash.2d 584
KING COUNTY, Respondent,
v.
TAXPAYERS OF KING COUNTY, Appellants, and
Washington State Major League Baseball Stadium Public Facilities District, Intervenor/Respondent, and
John Scannell, Vince Koskela and Frank Ruano, et al., Intervenors/Appellants.
No. 65062-4.
Supreme Court of Washington, En Banc.
Argued May 13, 1997.
Decided June 13, 1997.
As Amended October 9, and December 23, 1997.[*]
*1262 Montgomery, Purdue, Blankinship & Austin, John D. Blankinship, Seattle, Kris J. Sundberg, Mercer Island, for Appellant Taxpayers of King County.
John Scannell, Seattle, pro se.
Carl B. Nelson, Seattle, pro se.
William Severson, Seattle, pro se.
Norm Maleng, King County Prosecutor, Susan Slonecker, Kendall H. Moore, Mary I. Yu, Quentin R. Yerxa, Deputies, for Respondent King County.
Preston, Gates & Ellis, Paul Lawrence, Larry Carter, Seattle, for respondent Washington State Major League Baseball Stadium Public Facilities District.
Bart J. Waldman, Seattle, Amicus Curiae on Behalf of the Baseball Club of Seattle, L.P.
Christine Gregoire, Attorney General, William B. Collins, Asst., Jeffrey T. Even, Asst., Olympia, Amicus Curiae on Behalf of the State of Washington.
*1261 TALMADGE, Justice.
This is the third of a series of challenges to state legislation and local implementing ordinances for financing and constructing a new baseball stadium in King County. We are asked in this action to determine if King County's issuance of $336 million in bonds to finance stadium construction is "valid" under RCW 7.25. To determine validity, we must decide if the lease between the Mariners and the public facilities district is an unconstitutional gift of public monies to a private organization; if the taxes authorized by the Legislature to pay for the stadium financing bonds are constitutionally imposed and properly collected; if the state unconstitutionally delegated legislative authority to the public facilities district; and if a proposed local initiative establishing more stringent debt limitations for King County than authorized by statute is applicable to the baseball stadium project.
*1263 We hold the bonds issued by King County to finance stadium construction are valid because the use of public funds for a new baseball stadium here is not an unconstitutional gift of public monies to a private organization. Moreover, the taxes imposed to pay for the bonds are constitutionally imposed and properly collected. The state properly delegated authority to the public facilities district. The proposed local initiative is invalid insofar as it attempts to impose additional limitations on local debt not authorized by statute. We therefore affirm the trial court's declaratory judgment validating the $336 million in stadium construction bonds issued by King County.

ISSUES
1. What is the test for establishing the validity of bonds in a declaratory judgment action under RCW 7.25?
2. Did the lease entered into by the parties here constitute an unconstitutional gift of public funds to a private organization?
3. Were the taxes authorized by the Legislature to pay for the stadium financing bonds constitutionally imposed and handled?
4. Did the Legislature unconstitutionally delegate legislative authority to the District?
5. Can King County establish by ordinance limitations on debt beyond requirements set forth in statute?

FACTS
The Baseball Club of Seattle, L.P. (Mariners), is a Washington limited partnership formed in early 1992 for the express purpose of acquiring the Seattle Mariners Baseball Club to keep it in Seattle. Soon after acquiring the team, the Mariners began meeting with King County officials to modify the Kingdome lease and develop long-term capital plans. In 1994, a King County task force developed a plan for a new home for the Mariners, to be completed by 1999.
The 1995 Legislature considered legislation authorizing the financing of the new Mariners baseball stadium, ultimately enacting a baseball financing program at a special session on October 14, 1995. Laws of 1995, 3rd Sp. Sess., ch. 1 (Stadium Act). The key provision of the Stadium Act permits the "legislative authority" of a county with a population of one million or more to impose a sales and use tax in addition to other taxes under RCW 82.14, not to exceed .017 percent of the selling price in the case of a sales tax, or value of the article used in the case of a use tax. RCW 82.14.0485(1).[1]
Thereafter, Metropolitan King County Council (Council) on October 25, 1995 enacted Ordinance 12000, creating the Washington State Major League Baseball Stadium Public Facilities District (District), and imposing three special sales and use taxes the Stadium Act authorized, including a .017 percent special stadium sales and use tax, a special stadium sales and use tax on restaurants, bars, and taverns, and a special stadium sales and use tax on car rentals. The special stadium sales and use tax is a credit against the statewide sales and use tax as both RCW 82.14.0485(2) and section 3 of Ordinance 12000 acknowledge.[2] Under the Stadium Act, the revenues from these taxes may be used only to finance the stadium. RCW 84.14.0485(3). The purpose of the District is to construct and operate the new stadium.[3]
Pursuant to the comprehensive financing mechanism established by the Stadium Act and Ordinance 12000, the District by letter dated January 2, 1997, requested King County to issue bonds in the amount of $336 million, the amount necessary to finance construction *1264 of the baseball stadium. The Council passed Ordinance 12593 on January 6, 1997, authorizing the issuance of limited tax general obligation bonds in the requested amount.
Subsequently, on April 2, 1997, the Council passed Ordinance 12686, providing for the issuance and sale of the bonds. The County has already sold the bonds, but the bond sale proceeds are being held in escrow for release or refund, awaiting our decision in this action.
In addition to court challenges to the stadium, baseball stadium opponents have employed other methods to invalidate the stadium funding and construction bonds. On December 4, 1996, opponents filed a proposed initiative petition with the clerk of the Council. The clerk certified the petition as Initiative 16 on December 31, 1996. Section 1 of the initiative provides:
On or after January 1, 1997, King County shall not issue bonds or otherwise incur debt in an amount in excess of $50,000,000 for construction, remodeling, maintenance, or operation of any building or other facility without first obtaining approval of a majority of voters voting in an election at which the number of voters voting in said election equals at least one-half of the number of voters who are registered to vote at that election; nor shall King County impose or levy any tax to pay any such bond or indebtedness without such voter approval.
Clerk's Papers at 321. Initiative 16 purports retroactively to invalidate Ordinances 12593 and 12686, which, respectively, authorized and issued bonds in an amount in excess of $50 million.[4]
Intervenors in this case also filed a referendum petition with the Council clerk on January 7, 1997, proposing that Ordinance 12593 (authorizing issuance of the bonds) be put to a public vote. The Council clerk, based on advice from the King County Prosecuting Attorney's office that Ordinance 12593 was not subject to referendum, did not process the referendum petition.
On January 21, 1997, the County filed a complaint seeking a declaratory judgment under RCW 7.25.020 validating the bonds. Specifically, the County sought a declaration:
a. confirming the right and authority of King County to issue and sell bonds described in King County Ordinance No. 12593 (the "Bond Ordinance") ... adopted pursuant to the provisions of the [Stadium] Act and Ordinance No. 12000, and that such issuance comports with the requirements of the state constitution, state statutes and is within the County's authority;
b. determining that Initiative 16 is inapplicable to the issuance of the Bonds as authorized by the Bond Ordinance;
c. determining that the Bond Ordinance was lawfully enacted and not subject to referendum.
Clerk's Papers at 2.
On February 19, 1997, the trial court heard cross-motions for summary judgment. By memorandum decision dated February 24, 1997, the trial court granted the County's motion for summary judgment and denied the defendants' motion. The trial court entered a declaratory judgment in favor of the County on February 26, 1997, holding the bonds were valid and Initiative 16, if enacted, would "irreconcilably conflict" with state law. Clerk's Papers at 1104. On March 26, 1997, after losing their motion for reconsideration, the Taxpayers filed a notice of appeal. We accepted direct review. RAP 4.2(b).

ANALYSIS
A. Declaratory Judgments of Local Bond Issues
This case is before us under RCW 7.25 providing for declaratory judgments as to local bond issues:

*1265 Whenever the legislative or governing body of any county, city, school district, other municipal corporation, taxing district, or any agency, instrumentality, or public corporation thereof shall desire to issue bonds of any kind and shall have passed an ordinance or resolution authorizing the same, the validity of such proposed bond issue may be tested and determined in the manner provided in this chapter.
RCW 7.25.010. The statute, by its wording, contemplates an advisory opinion from a court as to the validity of an ordinance authorizing an issuance of bonds. Courts in other jurisdictions have articulated the purpose of bond validation statutes. For instance, the Mississippi Supreme Court said:
The main purpose of a statutory validation proceeding is to provide a forum and course of legal procedure to which a political district or subdivision may resort for the purpose of having the validity of the proposed bonds finally determined and adjudicated in advance of their issuance, "in order that the bonds so validated might be readily sold in the market, to create in the mind of the bond buyer a sense of security, in that by the decree of the court and the fiat of the Legislature there could be no further attack upon the validity of the bond issue."
Street v. Town of Ripley, 173 Miss. 225, 161 So. 855, 859, 102 A.L.R. 82 (1935) (quoting Love v. Mayor & Bd. of Aldermen, 162 Miss. 65, 138 So. 600, 603 (1932)). See also State v. City of Miami, 113 Fla. 280, 152 So. 6, 8 (1933).[5] "The desirability of obtaining a judicial decree validating bonds before they are issued is obvious: all parties may then rely upon the decree as conclusive regarding the issue of validity." 3 M. DAVID GELFAND, STATE & LOCAL GOVERNMENT DEBT FINANCING § 14:05, at 14-17 (1994). We agree.
We have considered cases under RCW 7.25 on many occasions,[6] but neither the statute nor our cases illuminate what constitutes a "valid" bond for purposes of the statute. Rather, the Court has simply dealt with particularized challenges to a bond issue's validity advanced in each case.
Many courts have taken a cautious view of the scope of bond validation proceedings, limiting such decisions to basic questions involving the procedure for issuance of the bonds and legal issues directly bearing on the bonds' propriety. Ward v. Commonwealth, 685 A.2d 1061, 1063 (Pa.Commw.1996); Murphy v. City of Port St. Lucie, 666 So.2d 879, 880 (Fla.1995) (collateral issues not within purview of bond validity proceeding).
A leading treatise on municipal law offers the following guidelines for testing the validity of a bond:
1. Is there legislative or constitutional authority delegated to the municipality to issue the bonds for the particular purpose?
2. Was the statute authorizing the bond issue constitutionally enacted? If not constitutionally enacted or if unconstitutional for any other reason, the issue is void and recitals are of no effect.
3. Is the purpose for which the bonds are issued, a public and corporate purpose, as distinguished from a private purpose?
15 EUGENE MCQUILLIN, MUNICIPAL CORPORATIONS § 43.04, at 575 (3rd ed.1995).
*1266 Although we have held the plaintiff in a declaratory judgment suit under RCW 7.24 has the burden of proof, see Taylor v. State, 29 Wash.2d 638, 641, 188 P.2d 671 (1948); Washington Beauty College v. Huse, 195 Wash. 160, 164, 80 P.2d 403 (1938), in the previous cases under RCW 7.25, we have not discussed the burden of proof. The statute itself is silent on the question; it requires only that the issuing agency set forth in the complaint for declaratory judgment the ordinance authorizing the bonds, and state it is seeking a determination of the right to issue the bonds. RCW 7.25.020. Courts discussing the burden of proof in bond validation cases have held the burden of proof is on the party seeking validation. See Harrell v. Town of Whigham, 141 Ga. 322, 80 S.E. 1010 (1914); Fox v. Boyle County, 245 Ky. 27, 53 S.W.2d 192 (1932).
For purposes of determining the validity under RCW 7.25 of bonds issued by a local government, we expressly adopt the three-issue formulation for "validity" of bonds articulated in MCQUILLIN. Under RCW 7.25, our decision regarding the validity of bonds is conclusive as to any matter that is or should be brought within the ambit of the validity inquiry. Thus, in the present case, we address issues pertaining to whether the lease is a gift to the Mariners, the validity of taxes to pay the stadium financing bonds, the delegation of legislative authority to the District, and the local initiative/referendum measures designed to forestall issuance of the bonds. Moreover, we hold the burden of proving the validity of the bonds rests with King County and the District as the parties seeking to establish validity.
B. Use of Public Funds to Build a New Stadium Does Not Constitute Unconstitutional "Aid" to the Mariners
In applying the test for validity set forth above to this case, we note the Taxpayers do not challenge the legislative or constitutional authority of the County to issue the bonds. Moreover, we have already determined the bonds have a necessary public purpose. Citizens for More Important Things, 131 Wash.2d at 416, 932 P.2d 135. Thus, the only item left to consider from the three-issue formulation is whether the statute authorizing the bond issue was constitutionally enacted.
The Taxpayers initially contend the bond issue violates CONST. art. VIII, §§ 5 and 7.[7] "The `aid' is in the form of construction at public expense of a new place of business for the [Mariners] to enhance its chance of making money." Br. of Appellants at 9.
At oral argument, counsel for the Taxpayers advanced the view that any benefit to a private organization may be violative of these constitutional provisions. We disagree. As we stated in City of Tacoma v. Taxpayers of Tacoma, 108 Wash.2d 679, 701-02, 743 P.2d 793 (1987), our purpose in that case was to narrow the application of these constitutional provisions to remedy more precisely "the evils the framers sought to prevent." An incidental benefit to a private individual or organization will not invalidate an otherwise valid public transaction. Id. at 705, 743 P.2d 793.
We held in CLEAN the stadium financing plan "does not amount to a gift of state funds nor a lending of the State's credit." CLEAN, 130 Wash.2d at 800, 928 P.2d 1054. We suggested, however, that should the District "enter into an agreement with the Mariners that would permit the ball club to play its games in the stadium for only nominal rent, then the constitutional prohibitions against making a gift of state funds might be implicated." Id. This discussion in CLEAN is essentially the test for an unconstitutional gift of public funds we have articulated in numerous cases.
*1267 In deciding whether a public expenditure is a gift under art. VIII, §§ 5 and 7, we have focused on two factors: consideration and donative intent. City of Tacoma v. Taxpayers of City, 108 Wash.2d 679, 702, 743 P.2d 793 (1987). Thus, to meet the burden of showing violation of the constitutional prohibition against gifts, the Taxpayers must show the lease amounts to "a transfer of property without consideration and with donative intent." General Tel. Co. v. City of Bothell, 105 Wash.2d 579, 588, 716 P.2d 879 (1986).
In assessing consideration, courts do not inquire into the adequacy of consideration, but employ a legal sufficiency test. Adams v. University of Wash., 106 Wash.2d 312, 327, 722 P.2d 74 (1986); Northlake Marine Works, Inc. v. City of Seattle, 70 Wash. App. 491, 857 P.2d 283 (1993). We have been reluctant to engage in an in-depth analysis of the adequacy of consideration because such an analysis interferes unduly with governmental power to contract and would establish a "burdensome precedent" of judicial interference with government decisionmaking. City of Tacoma, 108 Wash.2d at 703, 743 P.2d 793.
Legal sufficiency "is concerned not with comparative value but with that which will support a promise." Browning v. Johnson, 70 Wash.2d 145, 147, 422 P.2d 314, amended, 430 P.2d 591 (1967) ("`[A]nything which fulfills the requirements of consideration will support a promise whatever may be the comparative value of the consideration, and of the thing promised.' 1 WILLISTON, CONTRACTS § 115, cited in Puget Mill Co. v. Kerry, 183 Wash. 542, 558, 49 P.2d 57, 64, 100 A.L.R. 1220 (1935)."). The adequacy of the consideration for the lease is a question of law. "Whether a contract is supported by consideration is a question of law and may be properly determined by a court on summary judgment." Nationwide Mut. Fire Ins. Co. v. Watson, 120 Wash.2d 178, 195, 840 P.2d 851 (1992).
The Taxpayers now argue the lease agreement between the District and the Mariners for the use of the new stadium provides for only nominal rent and grossly inadequate consideration, thus implicating the constitutional concern about gifts of state money we mentioned in CLEAN. The Taxpayers argue both donative intent and grossly inadequate return are present here.
A summary review of both the Stadium Act's requirements and the elements of the lease identifies the Mariners' obligations. The Stadium Act required (1) a commitment from the Mariners to play at least 90 percent of its games at the new stadium for the length of the term of the bonds; (2) a contribution of $45 million towards either pre-construction or construction costs of the stadium or associated facilities; and (3) profit-sharing with the District for the term of the bonds of profit earned after accounting for team losses after the effective date of the Act. RCW 82.14.360(4). These provisions all appeared in the lease.
The lease between the Mariners and the District contains the following additional obligations of the Mariners:
 payment of $700,000 in rent per annum
 payment of any construction cost overruns
 payment of any deficiencies on bonds for the parking facility
 maintenance and operation of the ballpark as a "first-class facility" in accordance with a management plan, and with oversight by the District, with enforcement mechanisms to ensure compliance
 making major repairs and capital improvements to the ballpark
 provision of insurance
Despite the Mariners' obligations under the lease, the Taxpayers call the lease "unconscionable," Br. of Appellants at 24-25, arguing the consideration for the lease in favor of the County is so grossly inadequate the building of the stadium at public expense amounts to an unconstitutional gift.
The Taxpayers assert the County will receive nothing in return for its investment; thus, donative intent is present here. This assertion is simply another way of stating their main point: that the lease is so much in favor of the Mariners, it amounts to a gift. In CLEAN, the Court said, "In our judgment, a plain reading of the Stadium Act reveals no intent by the Legislature to donate *1268 public funds to the Seattle Mariners." CLEAN, 130 Wash.2d at 799, 928 P.2d 1054. The County and the District, in issuing bonds pursuant to the Stadium Act, have implemented the Stadium Act by obtaining the statutorily required commitments from the Mariners. No donative intent is present here.
The Taxpayers assert the Mariners' obligations under the lease are a "sham and illusory," and "truly do not give the public anything of value." Br. of Appellants at 26. Their arguments do not bear close scrutiny in light of the Mariners' contribution of $45 million to the project, the profit-sharing provision, the 20-year lease obligation, the stadium maintenance requirement, and their obligation to pay insurance.
The Taxpayers say the $45 million will not come out of the pockets of the Mariners, but rather "from revenues of the ballpark owned by the PFD." Br. of Appellants at 27; Clerk's Papers at 104. This argument is without merit. Whether the money comes out of the Mariners' coffers or from income the Mariners would have otherwise received, the Mariners will contribute $45 million.
The Taxpayers claim the profit sharing requirement in the lease is an "illusion," because the Mariners can doctor their books to pump up expenses as offsets to revenues in a way that will never show a profit. Br. of Appellants at 27. The County responds by noting the lease requires the Mariners' payments and expenses "be determined in accordance with generally accepted accounting principles[,]" Clerk's Papers at 151, and that the County has the right to audit the Mariners' accounting to ensure compliance with GAAP. Moreover, the mere possibility the Mariners may breach its promise in the future on its obligation to share profits with the County does not make this provision of the lease illusory. "An illusory promise is one which according to its terms makes performance optional with the promisor[.]" Mithen v. Board Of Trustees Of Cent. Wash. State College, 23 Wash.App. 925, 932, 599 P.2d 8 (1979). The Mariners made an enforceable promise to share profits. The promise is not illusory.
The Taxpayers argue "the Club's promise to do business in the new ballpark is illusory because it has escape routes through the lease conditions[.]" Br. of Appellants at 28. The Taxpayers' argument is disingenuous. The cited pages of the lease do not provide "escape" provisions that allow the Mariners to leave of their own volition. They merely set forth certain obligations of the District, which, if not met, would allow the Mariners to terminate the lease. There are no escape routes that make illusory the Mariners' promise to play 90 percent of their games in the new stadium over the term of the lease. The Taxpayers neglect to mention the $700,000 annual rental due from the Mariners.
The Taxpayers contend the Mariners' agreement to be exclusively responsible for operations and maintenance of the ballpark is insignificant because the lease's definition of operations and maintenance does not include replacement or major repair. While the Operations and Maintenance section of the lease does not contain a repair obligation, the Major Maintenance and Capital Improvements section of the lease does. The Mariners agree to perform "all Major Maintenance and Capital Improvements so that the Ballpark is maintained in a manner consistent with [a first-class facility]." Clerk's Papers at 156. "Major Maintenance and Capital Improvements" is defined to include "any work that is reasonably required to be performed... to repair, restore or replace components of the [Ballpark] necessitated by any damage, destruction, ordinary wear and tear, defects in construction or design, or any other cause, to the condition required for consistency with [a first-class facility]." Clerk's Papers at 156-57. This obligation is substantial, particularly given the very recent history of very substantial public expenditures to repair the Kingdome roof.
Finally, the Taxpayers assert without argument the requirement to maintain insurance is for the benefit of the Mariners. In fact, the insurance the lease requires the Mariners to procure must protect the District "from all claims arising as a result of the ownership, use, management and operation of the [stadium]." Clerk's Papers at 175. The Mariners are required to name the *1269 District as an additional insured on its liability policy. Such insurance is obviously not for the Mariners' sole benefit.
At its core, the Taxpayers' argument is the District and the County made a bad deal. While that may or may not be true, "The wisdom of the King County plan is not for the consideration of this courtits constitutionality is." Louthan v. King County, 94 Wash.2d 422, 427, 617 P.2d 977 (1980). The Taxpayers have failed to demonstrate a constitutional infirmity under CONST. art. VIII, §§ 5 and 7. The Taxpayers' assertion the Mariners' promises pursuant to the lease are illusory is unsupported. In the absence of donative intent or grossly inadequate return, the Court's review is limited to the legal sufficiency of the consideration for the lease. City of Tacoma, 108 Wash.2d at 703, 743 P.2d 793. This lease met the test of legal sufficiency. No violation of art. VIII, §§ 5 or 7 of our Constitution is present here.
C. The Collection of Stadium Sales and Use Tax Does Not Violate Constitutional Requirements
The Taxpayers make four arguments about the collection of the stadium sales and use tax. First, they argue the funding scheme is unconstitutional because it imposes a nonuniform state sales tax, requiring King County residents to pay state sales tax at a higher rate than residents of other counties. Second, they argue in the alternative the funding scheme is unconstitutional because King County residents pay less than their proportionate share of state sales tax. Third, they argue the .017 percent sales tax is being unconstitutionally diverted to the County, whereas the state constitution requires tax revenues to be deposited in the state treasury. Fourth, they argue the handling of the .017 percent sales tax violates the state constitution.[8]
The Stadium Act as implemented by Ordinance 12000 imposes a .017 percent sales tax in King County. The Taxpayers claim this taxes King County residents at a percentage rate higher than the rate residents of other counties pay. The "distribution of the burdens of taxation should be uniform.... A tax levied for state purposes shall be uniform throughout the state[.]" Bond v. Burrows, 103 Wash.2d 153, 157, 690 P.2d 1168 (1984) (differential state sales tax rate for counties bordering other states held unconstitutional).
The Taxpayers' argument is simply incorrect. The state sales tax is 6.5 percent. RCW 82.08.020(1). The Taxpayers say the Stadium Act and Ordinance 12000 impose in King County a state sales tax .017 percent greater than in other counties. The Taxpayers ignore the provision of the Stadium Act that treats the .017 percent as a deduction against the 6.5 percent the King County taxpayers contribute to the state sales tax: "The tax imposed under subsection (1) of this section [the .017 percent tax] shall be deducted from the amount of tax otherwise required to be collected or paid over to the department of revenue under chapter 82.08 or 82.12 RCW." RCW 82.14.0485(2). Thus, the taxpayers of King County do not pay more than 6.5 percent state sales tax.
CONST. art. XI, § 9, reads: "No county, nor the inhabitants thereof, nor the property therein, shall be released or discharged from its or their proportionate share of taxes to be levied for state purposes, nor shall commutation for such taxes be authorized in any form whatever." If, the Taxpayers argue, the .017 percent is deducted in King County from the statewide 6.5 percent sales tax rate, then King County residents are paying only 6.483 percent sales tax for state purposes, and are essentially being unconstitutionally "released or discharged" from their fair share of taxes levied for state purposes.
This argument would have some force if the .017 percent were not being collected for a state purpose by a political subdivision of the state. But the County, a political subdivision of the state, is collecting revenues for a state purpose. The building of the baseball *1270 stadium serves a state purpose, as we stated in CLEAN:
If it is true that the existence of a major league baseball team in a city improves the economy of the state in which that city is located and enhances the fabric of life of its citizens, and we believe it is the prerogative of the Legislature to conclude that it does, it is certainly within the general police power of the State to construct a publicly owned stadium in order to promote those interests.
CLEAN, 130 Wash.2d at 806, 928 P.2d 1054. The Taxpayers apparently agree: "Since the.017% tax is imposed to fund part of the State contribution to the Mariners stadium, the tax is clearly for `state purposes.'" Br. of Appellants at 35. Given the Taxpayers' concession on the issue, their argument that King County residents are paying less sales tax to the State than the residents of other counties dissolves.
In summary, the sales tax rate the residents of King County are paying pursuant to the Stadium Act and Ordinance 12000 is neither more nor less than the sales tax rate in other counties. It is the 6.5 percent, statewide, statutory rate.
CONST. art. VII, § 6, requires "[a]ll taxes levied and collected for state purposes shall be paid in money only into the state treasury." The Taxpayers claim the tax revenues to be collected under the Stadium Act do not go into the state treasury, yet they offer no facts to support their claim. Taxes authorized by RCW 82.14 "shall be deposited by the state department of revenue in the local sales and use tax account hereby created in the state treasury." RCW 82.14.050 (emphasis added). Contrary to the Taxpayers' argument, the taxes are deposited in the State Treasury.
The Taxpayers also claim CONST. art. VIII, § 4 prevents the diversion of the .017 percent sales tax to the County. Article VIII, section 4, provides, in pertinent part: "No moneys shall ever be paid out of the treasury of this state, or any of its funds ... except in pursuance of an appropriation by law." The Taxpayers assert, "diversion to the County of up to .017% of whatever state sales taxes the Department of Revenue collects in King County cannot reasonably be considered a form of appropriation because the amount will always vary and will never be a distinct specific sum known to the Legislature." Br. of Appellants at 37.
"The object of the constitution art. 8, § 4 ... is to prevent expenditures of the public funds at the will of those who have them in charge, and without legislative direction." State v. Clausen, 94 Wash. 166, 173, 162 P. 1 (1917). The state treasurer cannot spend those funds "at will," because state statute prescribes the disposition of local sales and use taxes:
Monthly the state treasurer shall make distribution from the local sales and use tax account to the counties, cities, transportation authorities, and public facilities districts the amount of tax collected on behalf of each taxing authority, less the deduction provided for in RCW 82.14.050 [administration and collection expenses]. The state treasurer shall make the distribution under this section without appropriation.

RCW 82.14.060 (emphasis added). Moreover, the funds collected are paid into a special account in the state treasury whose sole purpose is the payment of the bonds. RCW 82.14.0485(3). We observed in Municipality of Metro. Seattle v. O'Brien, 86 Wash.2d 339, 345, 544 P.2d 729 (1976):
Arguably the literal language of the constitution would require a legislative appropriation to disburse any funds from the state treasury under the express words of [art. VIII, § 4]. However, for many years, there has stood the commonsense interpretation by this court that the Treasurer may be made custodian of particular funds of a proprietary nature which are held for a specific purpose. Funds so held are distributable without specific legislative appropriation.
In Metro, we approved the account within the state treasury utilized by the Legislature in the Stadium Act. There, the state imposed a statewide excise tax on the value of automobiles. The state also authorized local governments to impose an additional local excise tax for public transit and also receive *1271 a credit against the state excise tax. Revenues thus derived were placed in an unappropriated special account in the state treasury to be disbursed to local governments for transit purposes, and did not violate article VIII, section 4. Similarly, the statutory collection procedure here is constitutional.
In summary, the Taxpayers have made no compelling constitutional or statutory arguments against the structure set up under the Stadium Act and Ordinance 12000 for the imposition and collection of sales and use taxes.
D. The Stadium Act Did Not Impermissibly Delegate Legislative Authority to the District
The Taxpayers also assert the Stadium Act impermissibly delegates legislative authority to the District. CONST. art. II, § 1 vests legislative authority in the Legislature. "It is unconstitutional for the legislature to abdicate or transfer to others its legislative function." Keeting v. Public Util. Dist. No. 1 of Clallam County, 49 Wash.2d 761, 767, 306 P.2d 762 (1957). The Taxpayers object to RCW 36.100.035(1), which gives the District the authority to determine the site of the baseball stadium, and to RCW 36.100.035(2), which gives the District the authority to determine the overall scope of the stadium project. According to the Taxpayers, the District's decisionmaking authority "goes far beyond merely executing law already in existence; the [District] is legislating." Br. of Appellants at 48.
The Taxpayers apparently believe that only the Legislature can decide where the stadium should be. They have misunderstood the law. The case the Taxpayers cite, American Fed'n of Teachers v. Yakima Sch. Dist. No. 7, 74 Wash.2d 865, 447 P.2d 593 (1968), contains a quotation from MCQUILLIN indicating that state government may delegate authority to municipal corporations:
While the rule is fundamental that the power to make laws cannot be delegated, the creation of municipal corporations to exercise local self-government has never been deemed to violate this principle. Such legislation is not regarded as a transfer of general legislative power, but rather as a grant of the authority to prescribe local regulations, supported by immemorial practice, but subject, of course, to the interposition of the superior in cases of necessity. Conferring proper powers upon municipal corporations forms an exception to the rule which forbids the legislature to delegate any of its power to subordinate divisions.
Id. at 869, 447 P.2d 593, quoting 2 MCQUILLIN, § 4.09 (3rd ed.1966).[9] The Legislature has properly delegated authority to a local municipal corporation to carry out a legislative determination. There is no unconstitutional delegation here.
E. Initiative 16/Referendum
Initiative 16, if enacted at a future election, has the potential to invalidate the bonds at issue here retroactively by requiring a public vote before the County may construct anything costing more than $50 million. The initiative purports to take effect January 1, 1997, two weeks before the bonds were issued in this case. The trial court ruled Initiative 16 conflicts with state law and therefore cannot, as a matter of law, affect the bonds.[10]
Initiative 16 purports to create a mechanisma public votefor retroactively *1272 invalidating an action authorized by state law. While legislative bodies may enact retroactive legislation in limited circumstances, such retroactive legislation may not affect vested rights. Godfrey v. State, 84 Wash.2d 959, 530 P.2d 630 (1975). There, we defined a vested right as "a title, legal or equitable, to the present or future enjoyment of property, a demand, or a legal exemption from a demand by another." Id. at 963, 530 P.2d 630.
In this case, the right of the County to issue bonds pursuant to the Stadium Act was such a vested right. The issuance of bonds created a contract between the County and bond holders. Legislation invalidating the issuance of the stadium bonds would impermissibly impair that contract. U.S. CONST. art. I, § 10; WASH. CONST. art. I, § 23.
In Ruano v. Spellman, 81 Wash.2d 820, 825, 505 P.2d 447 (1973), opponents of the proposed Kingdome sought to place on the ballot an initiative that would have repealed the resolution authorizing the project and the bonds to finance it. Id. at 822, 505 P.2d 447. In rejecting the initiative, the Court quoted Von Hoffman v. Quincy, 71 U.S. (4 Wall.) 535, 554, 18 L.Ed. 403 (1866): "It is equally clear that where a State has authorized a municipal corporation to contract and to exercise the power of local taxation to the extent necessary to meet its engagements, the power thus given cannot be withdrawn until the contract is satisfied." Ruano, 81 Wash.2d at 827, 505 P.2d 447.
An additional basis for concluding Initiative 16 is inapplicable to this bond issue is found in the trial court's analysis that Initiative 16 is in conflict with state law. Initiative 16 proposes a county ordinance requiring a vote of the people on projects costing more than $50 million. The state constitution, however, permits counties to incur indebtedness without a public vote if the indebtedness does not exceed 1.5 percent of the assessed value of property in the county: "No county, city, town, school district, or other municipal corporation shall for any purpose become indebted in any manner to an amount exceeding one and one-half per centum of the taxable property in such county, city, town, school district, or other municipal corporation, without the assent of three-fifths of the voters therein voting at an election to be held for that purpose." CONST. art. VIII, § 6 (amend 27). A state statute is to the same effect: "Counties, cities, and towns are limited to an indebtedness amount not exceeding one and one-half percent of the value of the taxable property in such counties, cities, or towns without the assent of three-fifths of the voters therein voting at an election held for that purpose." RCW 39.36.020(2)(a)(ii).[11]
The positive corollary to CONST. art. VIII, § 6 and the statute is that a county may incur indebtedness of less than 1.5 percent of the assessed value of property in the county, without a vote of the people, by issuance of councilmanic bonds. King County has done just that. Initiative 16 purports to deprive the legislative authority of King County of the power to do what the state constitution and state statute specifically permit it to doissue bonds without a vote of the people, even though the bond amount is below 1.5 percent of the assessed value of the property in the county. If no vote is required, however, no initiative or referendum could render invalid a decision by the legislative authority to incur such indebtedness. Thus, the trial court held Initiative 16 to be in irreconcilable conflict with state law, and held state law to be controlling.
The Taxpayers argue the constitutional and statutory debt limits provide a ceiling on the County's ability to incur debt without a vote of the people, but do not prevent the County from lowering the ceiling if it wishes to do so. They offer no authority for this argument.
A local government may not alter or restrict a legislative grant of power to that local government or its officers. "A general *1273 law enacted by the legislature is superior to, and supersedes, all charter provisions inconsistent therewith." Neils v. City of Seattle, 185 Wash. 269, 276, 53 P.2d 848 (1936) (ordinance concerning electric railways in the city not subject to referendum because state law granted exclusive power to city's legislative authority to control railways). In State ex rel. Guthrie v. City of Richland, 80 Wash.2d 382, 384, 494 P.2d 990 (1972), we said: "It is settled that any charter provision which has the effect of limiting or restricting a legislative grant of power to the legislative authority or other officer of a city is invalid."[12] In Guthrie, the Court considered whether a referendum was permissible to challenge a Richland city ordinance annexing contiguous territory as an addition to its water utility. A statute, RCW 35.92.070, did not require voter approval for proposed additions once the voters had approved the initial acquisition of the utility. We held the ordinance was not subject to referendum because the referendum purported to limit powers the statute granted to the legislative authority of the city.
Similarly, in Benton v. Seattle Elec. Co., 50 Wash. 156, 96 P. 1033 (1908), a 1903 statute gave to the legislative authority of cities the power to grant franchises for the construction of street railways. A 1908 amendment to the Seattle city charter purported to require the city council to submit street railway franchises to the voters for their approval. We held the amendment to the charter was invalid because the city charter could not limit or surrender the specific grant of power by the Legislature to the legislative authority to grant franchises. Id. at 163, 96 P. 1033. Similarly, Initiative 16 cannot have the effect of limiting the positive implication of the debt limit provision in the state constitution, i.e., the authority of the County to issue bonds without a vote of the people when the amount of the bonds is less than 1.5 percent of the assessed value of property in the County.
In Bidwell v. City of Bellevue, 65 Wash. App. 43, 827 P.2d 339, review denied, 119 Wash.2d 1023, 838 P.2d 690 (1992), a case very close to the present facts, the Court of Appeals employed the same reasoning as Guthrie in considering the effect of a different statute. Plaintiffs sought to compel the City of Bellevue to place an initiative on the ballot concerning the financing of the Bellevue Convention Center. The initiative would have required the Bellevue Convention Center Authority to obtain voter approval before issuing negotiable bonds or notes to finance the construction of the convention center. The debt resulting from the lease was less than 1.5 percent of the taxable property in Bellevue. Noting Guthrie found the proposed referendum invalid "because if would have limited or restricted a legislative grant of power to the City," the Court of Appeals held the initiative unlawfully conflicted with RCW 35.42.200, which permitted the city to execute leases without submitting them to the voters if the lease did not result in a total indebtedness in excess of 1.5 percent of the value of the city's taxable property. Bidwell, 65 Wash.App. at 49, 827 P.2d 339.
In Whatcom County v. Brisbane, 125 Wash.2d 345, 884 P.2d 1326 (1994), the Whatcom County Council adopted a Temporary Critical Areas Ordinance in 1992, pursuant to the Growth Management Act, which required counties to adopt comprehensive land use plans. Brisbane sought to challenge parts of the ordinance by means of referendum. We held the ordinance was not subject to referendum: "Referendum rights do not exist when power has been statutorily delegated to the `legislative authority'." Id. at 350, 884 P.2d 1326, quoting Citizens for Financially Responsible Gov't v. City of Spokane, 99 Wash.2d 339, 344-45, 662 P.2d 845 (1983).[13]
*1274 When the Legislature or state constitution has granted a power to the legislative authority of a municipality, the municipality may not limit the scope of that power, or surrender any of it under CONST. art. XI, § 11, our state supremacy clause. Carrick v. Locke, 125 Wash.2d 129, 133, 882 P.2d 173 (1994); Clallam County Deputy Sheriff's Guild v. Board Of Clallam County Comm'rs, 92 Wash.2d 844, 849, 601 P.2d 943 (1979). Under CONST. art. 11, § 11, counties have the right to enact ordinances prohibiting the same acts prohibited by state law so long as the state enactment was not intended to be exclusive and the county ordinance does not conflict with the general law of the state. City of Tacoma v. Luvene, 118 Wash.2d 826, 833, 827 P.2d 1374 (1992).
An ordinance must yield to a statute on the same subject on either of two grounds: if the statute preempts the field, leaving no room for concurrent jurisdiction, or if a conflict exists between the two that cannot be harmonized. Brown v. Yakima, 116 Wash.2d 556, 559, 807 P.2d 353 (1991).
CONST. art. VIII, § 6 and RCW 39.36.020(2)(a)(ii) grant to the legislative authority of counties the power to issue bonds when the amount of the bonds is below 1.5 percent of the assessed value of the property in the county. We hold these constitutional and statutory grants of power preempt the field, leaving no room for concurrent jurisdiction. That power is therefore not subject to referendum or initiative.[14]

CONCLUSION
We hold the bonds for financing construction of a baseball stadium in King County are valid under RCW 7.25. As a matter of law, the use of public funds to build the new baseball stadium does not represent unconstitutional aid to the Mariners. The Stadium *1275 Act and Ordinance 12000 do not manifest donative intent, and the return to the County is not grossly inadequate. There is legally sufficient consideration to support the promises of the Mariners. The Taxpayers' arguments about violation of constitutional requirements for the imposition and handling of tax revenues are factually incorrect, and without substance. The Legislature appropriately delegated authority to the District. The trial court was correct in holding Initiative 16, even if passed, cannot affect the bond issue because any future action that may impair the obligations contained in the bond contract is constitutionally impermissible.
In short, the Taxpayers have presented no compelling arguments to require reversal of the trial court's declaratory judgment under RCW 7.25 that the stadium financing bonds were valid. We affirm the trial court's declaratory judgment order validating the bonds.
DURHAM, C.J., and DOLLIVER, SMITH, GUY, JOHNSON and ALEXANDER, JJ., concur.
SANDERS, Justice (dissenting).
This action was commenced by the King County government to finally, permanently, and absolutely deny each of the million plus[1] county taxpayers (Taxpayers) any lawful defense or democratic remedy against imposition of $336,000,000 in additional public debt. The Taxpayers were denied an adequate and fair opportunity to present their case at the trial court; and our constitutional prohibition against public gifts to private parties has been overtly violated. I dissent.
The action proceeds as an inverted class action under the authority of RCW 7.25.020, whereby the county government sues each of its taxpayers through the device of naming two representatives to defend the interests of every other county taxpayer. As this is truly an extraordinary proceeding, I posit the courts have at least the normal duty, if not an extraordinary one, to ensure that the legal rights of all parties are fully recognized and protected, not only in procedural form but also in substantive result. The factual and legal basis for my grave concerns are summarized in this dissent.

Fast Track in Trial Court
To say the trial court track was fast is a gross understatement. The period from filing the complaint to summary judgment was only 37 days during which, for the most part, the trial court denied the Taxpayers any right to conduct discovery. Clerk's Papers (CP) at 1048-49.
On January 6, 1997, the King County Council by a vote of eight to five passed Ordinance 12593 authorizing issuance of $336 million in construction bonds for the new baseball stadium and adjacent parking garage. One week later, on January 13, 1997, the County commenced this suit. Bowing to virtually every governmental request to shorten time, and foreclosing virtually any opportunity for the Taxpayers to conduct even the most rudimentary discovery, the trial court heard the government's argument in support of its motion for summary judgment on February 19, 1997, 26 days after the government filed its summary judgment motion. CP at 1074.
Normally CR 56(f) would require reversal should it appear from the affidavits of the party opposing the motion (the Taxpayers) that they could not present by affidavit those facts essential to justify their opposition absent an opportunity to pursue discovery;[2] *1276 however, I would not reverse on this basis since, all considered, Taxpayers were not unfairly prejudiced because (1) the Herculean efforts of defense counsel produced a more than adequate factual record to avoid summary judgment of dismissal if the appropriate legal standard had been applied and (2) it really doesn't matter what sort of record the Taxpayers put together because the summary judgment on the gift issue resulted from the application of the wrong legal standard, not inadequacy of the record.
I am not without compassion for the trial court however. The trial court, and equally the Supreme Court, is asked to act in a summary fashion on a matter of great financial and political consequence under circumstances where it is claimed that even the shortest delay will derail a huge governmental public works project, regardless of its legal merit.
Upon this reality I can only reflect, without further commentary: haste makes waste; the best lawyers are often deprived an adequate opportunity to represent the interests of their clients if denied sufficient time; and courts sometimes commit error which could be avoided given an adequate opportunity to study the law, discern the facts, think, and reflect. A rush to judgment defeats justice.

Heightened Standard of Review
Noticeable by its absence from the majority opinion is any reference to the applicable standard of review. Here an extremely high standard is required by CR 56 and indirectly by RCW 7.25.010-.040.
A summary judgment will be sustained on review only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). The CR 56 standard has been applied by this court and appellate courts on countless occasions and generally requires that all facts or inferences therefrom be construed most favorably to the nonmoving party. Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982) ("A summary judgment motion under CR 56(c) can be granted only if the pleadings, affidavits, depositions, and admissions on file demonstrate there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.... The court must consider all facts submitted and all reasonable inferences from the facts in the light most favorable to the nonmoving party."). Klinke v. Famous Recipe Fried Chicken, Inc., 94 Wash.2d 255, 256-57, 616 P.2d 644 (1980) (summary judgment is not appropriate when reasonable minds might reach different conclusions); Avrick v. Rockmont Envelope Co., 155 F.2d 568, 571 (10th Cir.1946) (summary judgment should not be used "to deprive litigants of their right to a full hearing" and must be "temperately and cautiously used lest abuse reap nullification."); Whitaker v. Coleman, 115 F.2d 305, 307 (5th Cir.1940) (cautioning against using summary judgment as "a catch penny contrivance to take unwary litigants into its toils and deprive them of a trial"); Stephen J. Fortunato, Jr., Summary Judgment in Rhode Island: Is it Time to Wrap the Mantra in Celotex?, 2 Roger Williams U.L.Rev. 153, 204 (1997) ("summary judgment is a drastic remedy to be applied only with great caution." (citations omitted)).
The declaratory judgment proceeding contemplated by RCW 7.25 is in the nature of a CR 23 class action. It requires designation of representative defendants to represent (with government payment of defense attorney fees) the interest of all similarly situated absent class members. Although there is a paucity of precedent on RCW 7.25.010-.040, the analogy to CR 23 class actions is inescapably clear. CR 23 normally envisions a class of plaintiffs proceeding against specifically named defendants; however, in rare instances the device has been used to proceed on behalf of named plaintiffs against representatives of a class of defendants. In either case the court undertakes affirmative responsibilities to assure the legal interest of each absent class member is protected. CR 23(b)(1)(B). Gonzales v. Cassidy, 474 F.2d 67, 72 (5th Cir.1973) (the trial court must ascertain that the "class representative adequately represent the class so that the judgment in the class suit will bind *1277 the absent members of the class."); Marquardt v. Fein, 25 Wash.App. 651, 656-57, 612 P.2d 378 (1980) (class representative must fairly and adequately protect the interests of the class and responsibility for ensuring adequate representation must devolve upon the trial court).
It is therefore the court's responsibility to apply the summary judgment standard, with special deference given to absent class members, to all factual questions.
Therefore, with a focus on whether the stadium is an unconstitutional gift of public funds, on the text and purpose of the pertinent constitutional provision, on analysis of relevant case law, and on clarification of factual questions, I conclude: Were the Taxpayers not to receive a summary judgment on this record in their favor, they have surely raised at least a question of fact which only the trier of fact can resolve on remand for trial.

Unconstitutional Public Aid to Private Parties
Constitution article VIII, section 7 provides: "No county ... shall ... give any money, or property ... to or in aid of any individual ... or corporation." (Emphasis added.)
The issue here is what this means. Two alternative theories are advanced. The government, trial court, and majority of this court assert the constitution is satisfied if there is legally sufficient consideration (a peppercorn will do) to support the enforceability of a promise. This dissent demonstrates the constitution not only requires more consideration, it requires adequate consideration. The test employed dictates the outcome.

Standard of Constitutional Interpretation
Although we have been frequently called upon to apply this constitutional text to a variety of factual situations, the unambiguous language always controls. We held in an early case:
The section of the constitution last quoted, in most express terms, prohibits a county from giving any money, property or credit to, or in aid of, any corporation, except for the necessary support of the poor and infirm.
Johns v. Wadsworth, 80 Wash. 352, 354, 141 P. 892 (1914).
As has been clear since those days, the constitution makes no distinction between purposes but simply, directly, and unequivocally prohibits all gifts in aid of any corporation. Id. at 354, 141 P. 892. In Wadsworth, for example, the court struck down a grant to the Western Washington Fair. While conceding the appropriation was for a worthy purpose, educational in nature, "[t]here is no room, however, for construction. Unless plain, simple, direct words have lost their meaning, the legislature was without power to authorize the gift." Id. at 355, 141 P. 892.
We must also recall that the constitution is an expression of the will of the people, State ex rel. Albright v. City of Spokane, 64 Wash.2d 767, 394 P.2d 231 (1964), and the court performs but a limited role to apply the constitution as written. The court has no power to construe or interpret a provision that is clear, plain, and unambiguous in its terms. State ex rel. Anderson v. Chapman, 86 Wash.2d 189, 543 P.2d 229 (1975).

Evil Sought to Be Remedied
The majority correctly notes we should construe the constitutional provision to remedy "the evils the framers sought to prevent." Majority at 315 (citing City of Tacoma v. Taxpayers of Tacoma, 108 Wash.2d 679, 705, 743 P.2d 793 (1987)).
An increased level of judicial scrutiny is required in these situations "for the protection of public funds which may be potentially wasted. The court has acted as a watchdog to ensure the public funds will not be given away." City of Bellevue v. State, 92 Wash.2d 717, 724, 600 P.2d 1268 (1979) (Rosellini, J., dissenting).
Reversing a summary judgment in favor of municipal defendants, we held in State ex rel. O'Connell v. Port of Seattle, 65 Wash.2d 801, 806, 399 P.2d 623 (1965):
If Article 8, § 7 is too restrictive in its terms, that is a matter for the citizens of this state to correct through the amendatory *1278 process. It is not for this court to engraft an exception where none is expressed in the constitutional provision, no matter how desirable or expedient such an exception might seem.
We recall "a recurrence to the history of the times will show that many municipalities had become bankrupt because of liabilities incurred in aid of railroads, `and various other public improvements which were deemed advantageous' at the time." Wadsworth, 80 Wash. at 354, 141 P. 892; see also Tacoma v. Taxpayers, 108 Wash.2d at 701, 743 P.2d 793 ("[F]ramers intended to prevent the harmful `effects on the public purse of granting public subsidies to private commercial enterprises, primarily railroads.'") (citing City of Marysville v. State, 101 Wash.2d 50, 55, 676 P.2d 989 (1984)).
Justice Hale's concurrence in State ex rel. Graham v. City of Olympia, 80 Wash.2d 672, 687, 497 P.2d 924 (1972) opined that the purpose of article 8, section 7 was to prevent the use of public money by private entities for private purposes. The article was designed to prevent the use of public money for political favoritism, preferment, and manipulations, and "[i]t is designed to protect the public purse from private spending." Id.
By the time our constitutional convention convened in July 1889 many local governments had endured the unfortunate experience of subsidizing private corporations, particularly railroads, to lure them and keep them. See James M. Dolliver, Condemnation, Credit, and Corporations in Washington: 100 Years of Judicial DecisionsHave the Framers' Views Been Followed?, 12 U. Puget Sound L.Rev. 163, 182 (1989). At the constitutional convention the framers debated at length what was to be done. See Journal of the Washington State Constitutional Convention, 1889 at 679-84 (Beverly P. Rosenow ed., 1962). The version of article VIII, § 7, finally approved and popularly ratified, is the same which comes to us unchanged today. It was intended for the "protection of taxpayers and the public purse from the consequences of corporate political clout." David D. Martin, Comment: Washington State Constitutional Limitations on Gifting of Funds to Private Enterprise: A Need for Reform, 20 Seattle U.L.Rev. 199, 203 (1996); see also City of Marysville v. State, 101 Wash.2d 50, 55, 676 P.2d 989 (1984) ("[T]he framers of our constitution were deeply concerned about the effects on the public purse of granting public subsidies to private commercial enterprises, primarily railroads" and drafted article 8, sections 5 and 7 to prohibit the practice).
The motive and objective of this constitutional provision is to prevent the transfer of public assets from public entities, resulting in an inadequate return, or net loss, to the public. This has nothing to do with whether or not there is present such minimal consideration legally necessary to support a promise. If a public official may transfer $100 of taxpayer property for a $5 return to the taxpayers, they are $95 poorer. The return is inadequate regardless of the legal sufficiency of the consideration. The purpose of the provision is to avoid transactions which plunder the public purse to the benefit of private corporate wealth.
The constitutional text employs absolute and sweeping language to avoid this eventuality through use of the term "any," a term of total exclusion, as well as the term "aid," defined as "[t]o support, help, assist, or strengthen." Black's Law Dictionary 68 (6th ed.1990).
We have held it is the role of the courts to guard the public purse from expenditures in controversion of this article as it is a uniquely judicial responsibility to rigorously enforce this constitutional provision. See Miller v. City of Tacoma, 61 Wash.2d 374, 384, 378 P.2d 464 (1963) (whether public expenditures amount to an unconstitutional gift "is solely a judicial question and ultimately must be decided by this court."); see also Scott Paper Co. v. City of Anacortes, 90 Wash.2d 19, 33, 578 P.2d 1292 (1978) (no legislative attempt to define a gift for the constitutional provision would be meaningful because construction of the constitution is a judicial function); Washington Natural Gas Co. v. Public Util. Dist. No. 1, 77 Wash.2d 94, 101, 459 P.2d 633 (1969) ("article 8, section 7, prohibiting any city, county, town, or other municipal corporation from giving away its money or property or lending its money or credit to or in aid *1279 of any private entity is a mandatory provision and must be strictly observed.") (citing Johns v. Wadsworth, 80 Wash. 352, 141 P. 892 (1914); and State ex rel. Washington Navigation Co. v. Pierce County, 184 Wash. 414, 51 P.2d 407 (1935), modified by 187 Wash. 695, 60 P.2d 16 (1936)).

Sufficient Legal Consideration/Peppercorn Rule
Notwithstanding this text, history, and "evil sought to be cured," the majority claims "legally sufficient consideration" is all that is necessary to satisfy the constitutional provision. Majority at 1268. Misplacing its reliance upon Adams v. University of Washington, 106 Wash.2d 312, 327, 722 P.2d 74 (1986) the majority asserts "[i]n assessing consideration, courts do not inquire into the adequacy of consideration, but employ a legal sufficiency test." Majority at 1267. The majority also cites Browning v. Johnson, 70 Wash.2d 145, 147, 422 P.2d 314, 430 P.2d 591 (1967) (a private contract case, not a constitutional gift case) for the rule that "[l]egal sufficiency `is concerned, not with comparative value, but with that which will support a promise.'" Majority at 1267.
Of course. Even a peppercorn[3] is legally sufficient consideration to support a promise.[4] Under this standard, all of the State's timberland could be transferred to a large timber company for a penny (which could buy several peppercorns). While it is "legally sufficient" to support enforcement of a contractual promise, it is inadequate to protect our public assets.
The legal sufficiency rule is designed to enforce a bargain, but not necessarily to avoid a gift.

Mixture of bargain and gift. In most commercial bargains there is a rough equivalence between the value promised and the value received as consideration. But the social functions of bargains include the provision of opportunity for free individual action and exercise of judgment and the fixing of values by private action, either generally or for the purposes of the particular transaction. Those functions would be impaired by judicial review of the values so fixed. Ordinarily, therefore, courts do not inquire into the adequacy of consideration, particularly where one or both of the values exchanged are difficult to measure.... Even where both parties know that a transaction is in part a bargain and in part a gift, the element of bargain may nonetheless furnish consideration for the entire transaction.
Restatement (Second) of Contracts § 71, illus. c, at 174 (1979) (emphasis added).
Gross inadequacy of consideration may be relevant to issues of capacity, fraud and the like, but the requirement of consideration is not a safeguard against imprudent and improvident contracts except in cases where it appears that there is no bargain in fact.

Id. § 79, illus. "c," at 201-02 (emphasis added). The rationale behind requiring legally sufficient consideration to support a promise is therefore completely divergent from the purpose behind the constitutional prohibition against gifts: the former is to encourage and legally enforce free action between private persons; the latter is to protect the taxpaying public from public officials who would waste the assets they are duty-bound to preserve. Moreover, even a promise supported by legally sufficient consideration is not enforceable when it violates public policy. Williston, supra, § 4:42, at 672. Our state constitution is the ultimate source of public policy.
If a peppercorn of legal sufficiency was the constitutional barrier the framers devised to guard the public purse, they certainly did not achieve their objective.

*1280 Adequacy Rule
Contrary to the majority's claim, the modern constitutional test is stated and restated within the very cases the majority principally purports to rely on: Adams v. University of Washington, City of Tacoma v. Taxpayers, and CLEAN v. State, 130 Wash.2d 782, 928 P.2d 1054 (1996). None of this precedent has been overruled, nor does the majority even attempt to distinguish it.

Adams v. University of Washington, 106 Wash.2d 312, 722 P.2d 74 (1986) is the mother of modern authority on this topic. It articulates the rule quite differently from the majority:
Unless there is proof of donative intent or a grossly inadequate return, courts do not require into the adequacy of consideration.
Id. at 327, 722 P.2d 74 (citations omitted). City of Tacoma v. Taxpayers of City of Tacoma, 108 Wash.2d at 703, 743 P.2d 793, citing Adams, says almost the same:
Absent a showing of donative intent or gross inadequacy, the trial court should only apply a legal sufficiency test....
CLEAN specifically relied upon Taxpayers, holding "[i]t cannot be seriously contended that the development of a baseball stadium for major league team is a `fundamental purpose' of state government. Our inquiry must concentrate, therefore, on donative intent and consideration." CLEAN, 130 Wash.2d at 798, 928 P.2d 1054. CLEAN rejected a facial challenge to the Stadium Act, and speculated, absent a record before it:
If ... the [d]istrict should enter into an agreement with the Mariners that would permit the ball club to play its games in the stadium for only nominal rent, then the constitutional prohibitions against making a gift of state funds might be implicated.... In the unlikely event that this prediction should come true, the issue can then be raised in an appropriate manner.
CLEAN, 130 Wash.2d at 800, 928 P.2d 1054. "Nominal rent," like nominal consideration of $1 or $10 on the face of a deed, is "legally sufficient" consideration to support the promise.[5] Yet, as per CLEAN, it isn't enough to pass the constitutional adequacy test.
The majority concludes its analysis of case law by blandly stating: "[t]his lease met the test of legal sufficiency. No violation of art. VIII, §§ 5 or 7 of our Constitution is present here." Majority at 1269.
But what about the test for donative intent or gross inadequacy? While it is true if there is no legal sufficiency, there is no lawful transaction, that is not to say that if there is legal sufficiency there can be no gift. In short, the majority's approach is absolutely irreconcilable with Adams, Tacoma, and CLEAN. These cases hold if there is proof of donative intent or a grossly inadequate return, the courts must inquire into the adequacy of consideration as they would any other question of fact.
Upon this single point the case at bar turns. While I would concede there is sufficient legal consideration to support a promise, I find overwhelming evidenceevidence much beyond the simple inference necessary to defeat a summary judgment motionthat there is not only donative intent or[6] grossly *1281 inadequate return, but both, and they require a trial of the facts.

Donative Intent
"[D]onative intent is a factual issue to be resolved by the trier of fact." In re Estate of Pearl Fitzhugh Little, 106 Wash.2d 269, 288, 721 P.2d 950 (1986).[7]
This record contains two different types of proof and inferences therefrom which would support a finding of donative intent: narrative statements and grossly inadequate return.

a. Narrative Evidence of Donative Intent
Narrative evidence is correspondence, business records, and declarations, stating, in one form or another, that the raison d'etre for the stadium project is to aid the Mariners by making it more profitable for them to stay in Seattle than to go elsewhere. Such supports an inference of donative intent.
On September 28, 1995 Mariner chairman and CEO John W. Ellis wrote King County Executive Gary Locke (now Governor), restating what the Mariners had stated before, i.e., "we have clearly stated that a new stadium is required if major league is to be competitive and financially successful in this region.... We made it clear that without such a stadium we would have no alternative but to offer the team for sale.... Nor can we further jeopardize our investment...." CP at 615. The Mariners then complained about mounting financial losses, and stated their intention to leave the area unless a new stadium was built to cure their financial ills. The team sought aid to remain.
The Stadium Act authorized a "solution" to the team's financial problems. CP at 19. Ordinance 12000 proclaimed the new ball park would offer the club "certain revenue generating capabilities not presently available at the Kingdome." CP at 26. Why? to aid the Mariners. The county loaned the Public Facilities District $33 million for preconstruction costs for the ball park, even though the club could "walk away" from the project. CP at 1155. Why? To encourage the Mariners to stay because aid is on the way.
On December 20, 1996, United States Senator Slade Gorton, a supporter of the project, wrote King County Executive Locke, Mayor Rice, King County Council Chairman Jane Hague, and Joan Enticknap, Chairman of the Public Facilities District. Senator Gorton candidly stated in this letter that "Governor Lowry, the Legislature, and the community came together in such magnificent fashion to authorize the construction of a new baseball stadium and thus to save the Mariners more than a year ago." CP at 391. "Save the Mariners" through the use of public funds is also evidence of donative intent.
Senator Gordon related that he had recently "had extensive conversations with John Ellis, a close friend of more than 40 years," and indicated that the Mariners' announcement that they would leave town unless a stadium was constructed was "not a negotiating ploy." CP at 391-92. One inference: *1282 better provide the financial benefit the Mariners want or they will leave.
Gorton further identified Hiroshi Yamauchi, principal owner of the Nintendo Corporation in Japan, as the principal owner of the Mariners (although under the terms of the lease, neither Mr. Yamauchi nor the Nintendo Corporation has any direct or indirect liability. Nor did either, or anyone, ever post a personal guaranty, or any security, to assure the Mariners would perform their obligations). Senator Gorton made a point that, since these owners acquired the Mariners, they have incurred more than "$70 million in operating losses in the five seasons between 1992 and 1996." CP at 392. Gorton projected "based on projected attendance at levels never lower than 2,500,000 paid admissions per year for 20 years, under the terms of the agreement offered, the owners of the team would still suffer at least moderate, annual operating losses."[8] CP at 392. The import of the letter is that the Mariners are in financial trouble and they need financial aid in the form of a new stadium if they are going to remain in Seattle.
Further evidence of donative intent is supplied by the resignation letter from Shelly Yapp dated December 26, 1996, explaining her decision to resign from the Public Facilities District Board of Directors. She states:
[T]he balance of public and private interests has shifted radically and wrongly, in my view, to the welfare of the Mariners ownership over that of the public.... I cannot support the dramatic shift in the relationship, because I do not believe it serves the public interest for which the Board is supposed to be a steward.
CP at 663. In an attachment to the letter, dated December 23, 1996, Board Member Yapp detailed her concern that the government is spending $360 million to build a ball park which will be turned over to a private corporation to operate for private benefit. She said all the benefits are shifted to the club, yet all the risk is not shifted to the club; the lease provisions gut any oversight the PFD was intended to exercise to ensure that the public's asset is properly maintained; and "the club even dictates how the PFD spends the rent money it receives." CP at 666. She continued (I paraphrase):
1. Although it is nearly impossible for the PFD to terminate the club's lease for failure of the club to meet its obligations, the club may escape from its obligations through bankruptcy and opposed any provisions in the lease to guard against that eventuality.
2. The club has eliminated previously proposed lease conditions which require PFD agreement with plans for operating and maintaining the ball park. PFD does not have the money to enforce the lease because the rent won't cover the costs of enforcement.
3. The $700,000 per year rent for the brand new facility is half of the $1.3 million the club paid in 1995 to play in a 20-year-old Kingdome. The new lease, unlike the current one, entitles the Mariners to control the property 365 days per year, although the previous lease provided for only 85 regular games. Nor is there any attendance-based rent and "in fact, the PFD must pay rent for office space in the ball park it owns."
4. Although there is a profit sharing requirement in the Stadium Act "there will be no profit sharing under this lease. The Mariners so-called `true profit' is a numbers game that they control. Their definitions ensure that the public will not reap any returns in shared profits from the new stadium."
5. Contrary to public belief the Mariners are not putting up any equity contribution for the construction of the ball park. They will only put up money for the prospective operation of the ball park "and, if the experience of other recent ball parks is any guide, they will get the entire $45 million from naming rights of this public ball park. If they get more than $45 million for the naming rights, they keep it."
6. This $45 million is treated as a "contribution" to the construction of the ball park and as a "loss" which must be recouped before there is any profit sharing.

*1283 7. There are few requirements ensuring low cost public access to the stadium, and the Mariners will exercise exclusive control of any nonbaseball uses or amateur baseball uses of the ball park. The Mariners will retain all revenue from any of these uses. "There is not even a provision for free public tours of the ball park." There are few enforcement or accountability provisions in the lease to require public access or public benefits.
8. The Mariners will operate the ball park as a private operator and, thus, unlike the operator of the Seattle Center or the Kingdome, are exempt from competitive bidding, affirmative action plans, etc.
9. Although the public contribution to the stadium included a 10% contingency, they have insisted on an increase in the County bond amount by $15 million, which will ensure that their pledge to pay cost overruns never arises. They dropped the capital reserve fund from $15 million to $5 million, which means that in the final year of the lease, funds will not be sufficient to pay what we already know to be the scheduled capital repair and replacement costs.
10. If the team sells, there will be no opportunity to find a suitable local buyer.
With the capitulation to the demands and conditions of the Mariners, major league baseball may be saved for Seattle, but at the price of honest dealing and, in my view, at the expense of the interests of the public. Accordingly, I vote no on this lease.
CP at 665-68.
Applying the CR 56 summary judgment standard, I submit it is patently obvious that there is, at minimum, a question of fact regarding whether or not this transfer of a brand new baseball stadium to the exclusive control of a private, for-profit corporation for 20 years is motivated by donative intent. This factual issue may be determined only by the trier of fact, not the trial court sitting in summary judgment, nor this court.

Grossly Inadequate Return
Were this not enough, a further inference of donative intent arises from the following facts.
Many, many Washington cases[9] apply the term "grossly inadequate" by factual comparison to what is "adequate" under the particular facts. The question of gross inadequacy is one for the jury, not the court. Sova v. First Nat'l Bank of Ferndale, 18 Wash.2d 88, 104, 138 P.2d 181 (1943). In sum, something is "grossly inadequate" if it is less, by sufficient degree, than "adequate." What degree the jury must determine under all the facts *1284 and circumstances. Clearly we are measuring adequacy, not legal sufficiency.
By dictionary definition, "inadequate" is "[i]nsufficient; disproportionate; lacking in effectiveness or in conformity to a prescribed standard or measure." Black's Law Dictionary 758 (6th ed.1990).
The term "grossly inadequate" almost always refers to a transaction with "legally sufficient" consideration yet inadequate return. For example, in City of Tempe v. Pilot Properties, Inc., 22 Ariz.App. 356, 527 P.2d 515, 518 (1974) the court was faced with an alleged unconstitutional gift under a similar constitutional provision where the city of Tempe attempted to lease city land to the Seattle Pilots for a spring training camp for $1 a year. While the $1 payment may have constituted "legally sufficient" consideration, the court held a factual inquiry was required to assess whether the consideration received by the government was sufficiently inequitable and unreasonable to amount to an unconstitutional subsidy. Id. 527 P.2d at 522.
By this standard let us turn to the question at hand; i.e., is there any fact or inference in the record, when construed most favorably to the nonmoving party, which would indicate the consideration returned to the county is "grossly inadequate?"
To answer we must view the transaction as a whole. We do not have the luxury, as does the majority under the legal sufficiency test, to simply pick up one or two pennies and say, "Aha! Here is some consideration, and we need not inquire into its adequacy!"
I would be surprised if the majority would not concede my point, as I did theirs: while there is legally sufficient consideration to support a promise, there are certainly facts and inferences in the record to support a finding by the trier of fact that this return was "grossly inadequate."
The majority points to the following factors (I think to establish legal sufficiency which I concedebut not to establish adequacy which I contest):
1. The Mariners have committed to play at least 90 percent of their games at the new stadium.
2. They will contribute $45 million to the stadium.
3. There is a provision for profit sharing with the Public Facilities District.
4. The annual rent to the Public Facilities District will be $700,000.
5. The Mariners are responsible for construction costs overruns on stadium construction.
6. They are responsible to pay any deficiencies to construct the parking facilities after the bond amount has been exhausted.
7. The Mariners have the responsibility to operate the ball park as a first class facility.
8. The Mariners are responsible to make major repairs and capital improvements, and
9. The Mariners must provide insurance.
Majority at 1267.
None of these claimed benefits is even relevant to an "adequacy" legal analysis which is primarily concerned with (1) what the taxpayers give and (2) what they take in return; not with the extent to which the Mariners will prosper or what expenses they must pay before making a profit. None of the above factors will result in any return to the taxpayers; they basically relate to the cost of the Mariners' doing business, which includes the cost to maintain a stadium provided to them at largely public expense where they do business for nominal rent. But the constitution requires us to protect the taxpayers. If the Mariners incidentally benefit absent unconstitutional aidso much the better; if they falter, that is not a ground for public expenditure. Northlake Marine Works, Inc. v. City of Seattle, 70 Wash.App. 491, 510, 857 P.2d 283 (1993). Therefore questions relating to the operation of the stadium are not relevant unless the taxpayers of the county will gain or lose therefrom. In general Professor Baade concluded that there was no measurable economic benefit to the county from the Mariners under this lease. CP at 710.
*1285 1. 90 Percent of Games
Whether or not the Mariners play 90 percent of their games in the new stadium will have no fiscal impact on the county.
2. $45 Million Contribution
A Mariner contribution of $45 million toward the construction cost might make this a more valuable asset; however, the record shows at the expiration of the 20-year lease the facility will have no value. Affidavit of James P. Quirk (retired professor of economics), CP at 758 (the projected life of the stadium is 20 years; "a 20 year old major league baseball-only stadium without a major league baseball team tenant has essentially no market value, especially in a small market city such as Seattle....").
3. Profit-Sharing
There will be no profits to share. Even the trial court agreed the record demonstrated there would be no profit. CP at 1082. After lengthy analysis, Professor Quirk concluded there would be no profits, CP at 762-65; Professor Baade opined there would be no profits. CP at 710. The lease details numerous deductions to be applied prior to arriving at net income. CP at 150, Lease, Paragraph 5.2.3. All losses since 1995 are carried forward and must be repaid to the Mariners before there is any profit. CP at 150-01, Lease, Paragraph 5.2.
4. $700,000 Rent
A $700,000 per year annual rent to the PFD (1) is no return to the taxpayers and (2) is nominal at that. CP at 709, 766, 788. The trial court found it is "very low." CP at 1082. In answer to interrogatories, the county said it would receive no rent whatsoever; all would go to the Public Facilities District. CP at 687. Under terms of the lease, the Public Facilities District must utilize the annual rent for stadium purposes, not return it to the county. CP at 149, Lease, Paragraph 5.1.3. According to the Declaration of Professor Baade, a $700,000 annual rent is but a nominal return on $336 million.[10] Normal fair market return on capital would be in the area of 10 percent, which would require an annual rent of $33,600,000 (approximately one year of interest on the debt). If the fair market value of the stadium were counted (including the Mariners $45 million contribution and real estate donated by the county), the 10 percent would be calculated on $414 million (CP at 759), for an annual rent of $41,400,000. $700,000 measured against an even lower capital value represented by only the $336,000,000 in bonded debt is 0.2 percent, 50 times less than the fair market rent. CP at 709. The trial court accepted this figure as well. CP at 1100.
5. Cost Overruns
The payment of construction cost overruns does not represent a return to the County, given the stadium will be obsolete at the expiration of the lease and under exclusive private control until then. Moreover, construction cost overruns are very unlikely. See Declaration of Mark Baerwaldt. CP at 733 (construction cost overrun is unlikely because of $60 million contingency fund).
6. Parking Deficiencies
The Mariners will pocket all parking revenue, estimated at $670,000 per year. CP at 146, 815, Lease, Paragraph 3.7.2. Payment of the deficiencies, if any, for the parking facility will not be a return to the taxpayers but rather a value added to the stadium, which will be obsolete at the end of the lease and under private entrepreneurial control until then. Moreover, such an eventuality is highly unlikely given the terms of the lease.
There will be no responsibility on the part of the Mariners until all admission taxes are first expended on this. CP at 146-47, Lease, Paragraph 3.7.3.
7. Operation of Ball Park
Maintenance and operation of the ball park as a "first class facility," once again, is not a *1286 return to the taxpayer, but rather maintains the stadium for the benefit of its exclusive occupant, the Mariners. Maintenance is routine and includes sweeping up debris. CP at 140-41, Lease, Paragraph 3.2.
8. Major Repairs
Under the terms of the lease, the Mariners' duty to make major repairs and capital improvements to the ball park will be first offset by excess construction funds held by the PFD. CP at 159, Lease, Paragraph 7.2.3. Excess admissions tax will be similarly used. Id. Replacement and repairs due to ordinary wear and tear are excluded by the lease. CP at 140, Lease, Paragraph 3.2. If repairs become too expensive, the Mariners may break the lease and walk away. CP at 167. There is a maximum club obligation of $15,000,000. CP at 164, Lease, Paragraph 7.7.6.
9. Insurance
The requirement that the Mariners provide insurance is at best an indemnification of the PFD against further liabilities occasioned by the Mariners' operation of the stadium. The cost of this insurance is unknown, but will not be a return to the taxpayers in any event. Absent a stadium being operated exclusively for the Mariners' benefit, such insurance would be unnecessary.
I suggest that a more appropriate analysis under the gift provision of the constitution does not involve Mariner finances, but only county finances, in the sense we must compare county expenditures against the monetary returns.[11]
The County will expend $336 million in bonded debt, transfer $45 million in naming rights to the Mariners (CP at 666), and transfer $6 million of image licensing rights to the Mariners as well (CP at 815). Virtually all of the Mariners' obligations are associated with the construction, maintenance, and operation of a stadium which the taxpayers built exclusively for their benefit over the useful life of the stadium, 20 years. Not even the annual rent will be returned to the taxpayers; it will go to the Public Facilities District and be recycled for stadium use. However, even if those annual $700,000 rent payments went directly to the taxpayers, they would amount to a total of only $14,000,000 over the course of the lease, compared to public expenditure of $336 million. $700,000 per annum payment is approximately one-fiftieth of the interest on the bonded debt. ($336 million times approximately 10% interest equals $33,600,000.) It doesn't amortize, or even come close. No private entrepreneur would build this stadium under these terms and conditionsunless (1) he is crazy and/or (2) he wants to make a gift to the Mariners.
There are other ways to look at this picture as well, but it is obvious the facts of record construed most favorably to the nonmoving party amply support the inference that the return to the taxpayers is "grossly inadequate" when compared to taxpayer expenditure.
Professor of Economics James Quirk testifies in the record, for example, "over the 20 year term of the lease agreement, the Mariners will receive an average annual subsidy (in constant 1999 dollars) of approximately $27,600,000 per year." CP at 757. He details this conclusion in a ten-page, single spaced, typewritten report with numerous schedules attached. For the purpose of the summary judgment standard, this report and all reasonable inferences therefrom must be accepted as true, at least insofar as other portions of the record do not present facts *1287 and inferences even more favorable to the Taxpayers.
There are 1,199 pages of record here. The lease is 108 pages long. This cannot be shoehorned into a summary judgment. If this record, construed most favorably to the Taxpayers, does not present at least one fact or inference of (1) donative intent or (2) a grossly inadequate return, I can't imagine what would.
Perhaps that is just the point.
The majority and the trial court never addressed the question because both insist upon looking for (and easily finding) a peppercorn of consideration rather than considering whether this transaction amounts to public aid to a private entity. Nor does either apply the standard of donative intent or grossly inadequate return, notwithstanding that is the constitution's standard and our case law's standard.

Legislation by Laches
A second critical and dispositive flaw in the majority's analysis is its assertion that Ordinance 12000 is valid notwithstanding the county's refusal to process a timely proposed referendum petition.
Since this is a declaratory judgment action initiated by the county against the class of county taxpayers, to prevail the county must establish the validity of the bond issue against any and all legal objections.[12] Establishing the validity of Ordinance 12000 is therefore essential to the county's success. The county claims:
Thus, while the County was not required to follow the Stadium Act and decide to build the stadium, once Ordinance 12000 became effective, creating the PFD, authorizing the levy of taxes for the construction of the stadium, committing the County to assemble the stadium property and issue the bonds, the County was bound by the prescripts of the Act, including the obligation to issue the bonds.
CP at 952 (King County and the Washington State Major League Baseball Stadium Public Facilities District's Reply to Taxpayers' Brief in Opposition to King County's Motion for Summary Judgment at 11 (Feb. 18, 1997)). Likewise, the majority also premises its decision on the validity of Ordinance 12000 and rejects the Taxpayers' claim they were improperly denied their right to refer Ordinance 12593 (passed by the County council on January 6, 1997, authorizing the issuance of bonds) to referendum in specific reliance upon the validity of Ordinance 12000 ("[T]he time to pursue that issue was in 1995 and it cannot be revived indirectly now through a challenge to the bonds to be issued to implement policy decisions made in Ordinance 12000." Majority at 1291 n.14.). Thus, according to the majority, "the Stadium Act mandates County issuance of the bonds once the County decided to proceed with a new baseball stadium, and declared this policy in Ordinance 12000." Majority at 1290 n.13.
Necessarily the validity of Ordinance 12593, which actually issued the bonds, is contingent on the validity of Ordinance 12000. Conversely, if Ordinance 12000 is invalid, derivative claims of bond legality must necessarily collapse like a house of cards.
The majority admits Scannell and Ruano submitted a timely proposed referendum petition on Ordinance 12000 and acknowledges the clerk rejected and otherwise refused to process same. That this rejection was unlawful the majority does not dispute. Moreover, the reason advanced to exempt Ordinance 12593 from referendum (incurring bonded debt less than 1.5 percent of assessed value) is facially inapplicable to Ordinance 12000. Rather, the majority asserts (1) the validity of Ordinance 12000 is established by laches and (2) "Scannell and Ruano have had their day in court as to the validity of Ordinance 12000." Majority at 1291 n.14.
We must evaluate these claims by the standard set forth in the King county Charter which not only creates the right to local referendum but also suspends the effective date of any ordinance subject to referendum:
Except as provided herein, the effective date of an ordinance shall be ten days after *1288 its enactment unless a later date is specified in the ordniance. If an ordinance may be subjected to a referendum as provided in Section 230.40 and if a proposed referendum petition is submitted to the clerk of the county council as provided in Subsection 230.60 prior to the tenth day after its enactment, the effective date of the ordinance shall be forty-five days after its enactment unless a later date is specified in the ordinance. If an ordinance is subjected to referendum, it shall not become effective until after it is approved by the voters.
King County Charter § 230.70 (italics added). The King county Charter creates a mandatory nondiscretionary procedure whereby proposed referendum petitions are submitted for approval for form:
The county council shall establish by ordinance the form to be used for referendum and initiative petitions. All referendum and initiative petitions shall be sponsored by an individual or committee of individuals which shall secure the approval of the clerk of the county council as to the form of the proposed petitions before circulating them. Within five days after the form of the proposed petitions as submitted to him, the clerk of the county council shall return it to the sponsor with an indication of his approval or with a detailed written explanation of his objection to the form.

King County Charter 230.60 (italics added). This proposed petition was timely submitted for approval to the clerk of the county council only one day after ordinance passage. The submittal cover letter of October 24, 1995 was signed by Frank Ruano and John Scannell as Committee Co-chairpersons for "Taxpayers on Strike."
Three days later, on October 27, 1995, Gerald A. Peterson, an "Administrator/Clerk with the King County Council,"responded that Ordinance 12000 is not subject to referendum, and "I have not assigned the document a serial number as a referendum petition nor will I process the document as a valid petition form." CP at 976. Thus, the clerk did not reject the proposed petition for alleged defects in form, but rather on the claim that the ordinance was simply not subject to referendum. By rejecting the petition, the clerk, acting on behalf of the county council, overtly prevented county citizens from affixing their signatures to referendum petitions, in direct derogation of their express right to do so guaranteed by King County Charter § 230.40.
Under these circumstances the question is whether the ordinance ever validly came into effect absent a vote of the people.
Before today we have said, "deliberate efforts by a legislative body to circumvent the initiative or referendum rights of an electorate will not be looked upon favorably by this court." Citizens for Financially Responsible Government v. City of Spokane, 99 Wash.2d 339, 351, 662 P.2d 845 (1983). Nor have we allowed government to insulate itself from the people's right to referendum by unilaterally refusing to authorize the circulation of referendum petitions until after the deadline for the return of signatures has passed. Just such an argument was rejected in CLEAN v. State, 130 Wash.2d 782, 928 P.2d 1054 (1996) where we proceeded to determine the claim on the merits that the Stadium Act was subject to a referendum, notwithstanding the failure of referendum proponents to gather sufficient signatures prior to the deadline, recognizing they were prevented from doing so by the Secretary of State's refusal to authorize a form of petitions to be circulated. However, unlike CLEAN, we are not here dealing with an ordinance possibly exempt from referendum because of an emergency clause, which Ordinance 12000 does not have, nor are we dealing with an ordinance exempt from referendum for any other reason.
Therefore we are left only to consider whether, as the majority posits, Ordinance 12000 is valid because of laches and/or because Scannell and Ruano have had their "day in court."

Laches
The majority holds:
Laches now prevents subjecting Ordinance 12000 to a referendum.
Majority at 1291 n.14.
However, laches is an affirmative defense which must be raised by answer. CR8(c).

*1289 In general, if affirmative defenses are not affirmatvely pled, asserted within a motion to dismiss for failure to state a claim, or tried by express or implied consent of the parties, they are deemed to have been waived and may not thereafter be considered as triable issues in the case; while this requirement is not construed absolutely, it will not be abrogated where substantial rights of the parties are affected.
KELLY KUNSCH, 1 WASH. PRACTICE, METHODS OF PRACTICE § 6.5, at 72 (4th ed. 1997) (citing Ranier Nat'l Bank v. Lewis, 30 Wash.App. 419, 635 P.2d 153 (1981)). Here, however, no party pleaded laches as an affirmative defense. More fundamentally, we are not here considering laches as an affirmative defense at all. Rather laches is raised as an aspect of the county's affirmative claim to establish ordinance validity. Compare Teachers Management & Inv. Corp. v. City of Santa Cruz, 64 Cal.App.3d 438, 448, 134 Cal.Rptr. 523, 530 (1976) ("Laches is an affirmative defense to a suit in equity; the doctrine has no application to the effectiveness of a statute or ordinance." (Citation omitted.)).
Even where laches is appropriately invoked, it is only available as a shield, but never a sword. 15 LEWIS H. ORLAND & KARL B. TEGLAND, WASH. PRACTICE § 606, at 406 (5th ed. 1996). Moreover, "those asserting [laches] must bear the burden of proof." Voris v. Washington State Human Rights Comm'n, 41 Wash.App. 283, 287, 704 P.2d 632 (citing Brust v. McDonald's Corp., 34 Wash.App. 199, 209, 660 P.2d 320 (1983)), review denied, 104 Wash.2d 1018 (1985).
A defendant who relies upon a laches defense bears the burden to prove the following elements:
(1) knowledge or reasonable opportunity to discover on the part of a potential plaintiff that he has a cause of action against a defendant; (2) an unreasonable delay by the plaintiff in commencing that cause of action; and (3) damage to the defendant resulting from the unreasonable delay.
15 LEWIS H. ORLAND & KARL B. TEGLAND, WASH. PRACTICE § 651, at 478 (5th ed. 1996) (citing Carlson v. Gibraltar Sav., 50 Wash. App. 424, 749 P.2d 697 (1988)). But here the county is plaintiff which seeks affirmative relief, not the defendant who resists it.
Notwithstanding the majority relies upon Lopp v. Peninsula Sch. Dist., 90 Wash.2d 754, 585 P.2d 801 (1978) to sustain the validity of Ordinance 12000 even though, unlike the case at bar, Lopp applied the doctrine when it was appropriately pleaded and proved as a true affirmative defense. Here county charter provisions clearly condition the effectiveness of any ordinance upon either exhaustion of the referendum procedure or an affirmative vote at the polls.
Unlike the case before us, laches was defensively used in Lopp as a shield to protect the school district against an untimely action to enjoin and otherwise prohibit the sale of $9.4 million in general obligation bonds. In December 1977 the Peninsula School Board authorized a special election to approve the issuance of school bonds. The election approving the bonds was held in February 1978. Plaintiff commenced the litigation in March 1978, one month after the special election, and also after the school district had received a favorable bid on the bonds. Absent a final determination of bond validity by June 15, 1978, the court found the school district would have been unable to accept the bid and the whole bonding procedure would have had to begin anew. Under those facts the trial court granted summary judgment to the school district against the plaintiff's claim. The Supreme Court affirmed, holding an injunction or mandamus remedy was subject to a laches defense, but with the specific qualification:
We do not critize appellant for not filing his action before the special election. The voters may have disapproved the bond issue thereby eliminating the necessity for a lawsuit.... [T]here are no facts before us that would lead us to conclude that appellant attemped to exercise his rights or that he at least tried to notify defendants of a possible lawsuit.
Lopp, 90 Wash.2d at 761, 585 P.2d 801.
This case, however, is nearly the opposite of Lopp. Here it is the county, not the citizen, which attempts to affirmatively establish the validity of the bond issue. Moreover, *1290 here it is the county that was on notice of the potential invalidity of Ordinance 12000 from the outset, since it was the county which by its own act unlawfully rejected the proposed referendum. Moreover, here King County was furnished even further notice of the alleged invalidity of Ordinance 12000 through a Thurston County action promptly commenced by Ruano and Scannell on December 22, 1995. CP at 895.[13] Here, King County had ample notice of the problem, yet did nothing. Moreover, the instant lawsuit was commenced almost immediately after the county had approved issuance of the bonds which, by analogy to Lopp, would not be a circumstance upon which the laches doctrine could be lawfully invoked in any case. Compare Lopp, 90 Wash.2d at 761, 585 P.2d 801.
Not only was laches unpleaded, unproved, and simply inapplicable to affirmatively establish the validity of an otherwise invalid local ordinance under any circumstances, the majority impermissibly allows a party with "dirty hands" to invoke the equitable doctrine of laches against its victim. Basic to equity is the proposition that a court of equity will not intervene on behalf of a party whose conduct has been unconscientious, unjust, or marked by a lack of good faith. Portion Park, Inc. v. Bond, 44 Wash.2d 161, 265 P.2d 1045 (1954); Income Investor, Inc. v. Shelton, 3 Wash.2d 599, 101 P.2d 973 (1940); 15 LEWIS H. ORLAND & KARL B. TEGLAND, WASH. PRACTICE § 651, at 479 (5th ed. 1996) (one must have clean hands to avail themselves of the benefits of the equitable doctrine of laches.)
The citizen defendants in this proceeding simply attempted to avail themselves of that civil right bestowed upon them by the county charter to properly subject an ordinance to referendum. Nevertheless, an agent of the same county council which adopted the offensive ordinance in the first place effectively abridged the right of these citizens to process their referendum request contrary to law and under circumstances which could be optimistically described, even at the time, as at best debatable.
Unlike other referendum proceedings which this court has reviewed, e.g., Snohomish County v. Anderson, 124 Wash.2d 834, 881 P.2d 240 (1994) and Whatcom County v. Brisbane, 125 Wash.2d 345, 884 P.2d 1326 (1994), King county did not initiate a declaratory judgment action against referendum proponents to promptly and with certainty determine the validity of the proposed referendum petition, as it could well have done here. Instead King County mocked Taxpayers' legal rights by stonewalling their referendum attempt for almost a year and a half until it commenced the instant action and capitalized on its own delay to cut off discovery by its adversary and force the proceeding through the courts in record time. Now the county relies upon its own unlawful refusal to process the referendum petition as a yet further reason to have the highest court in this State excuse the King County government from violating its own charter.
This court should not reward the county's lawless conduct at the expense of the citizens' civil right to subject a county ordinance to referendum.

"Their Day in Court"
With apparent reference to the pro se Thurston County Superior court action undertaken by Ruano and Scannell, the majority advances a second reason to sustain the validity of Ordinance 12000: "Scannell and Ruano have had their day in court...." Majority at 1291 n.14.
Noteworthy is the majority's failure to invoke the terms res judicata or collateral estoppel which, indeed, are the only legal doctrines arguably available to sustain the majority's result. I am not familiar with the "day in court" rule of issue preclusion nor does the majority aid my legal education with even the most rudimentary citation to authority.
It is also worthy of note that even the trial court expressly rejected the county's asserted res judicata claim in her memorandum decision:
Res Judicata does not apply, however, if there is no identity of parties, and application of the doctrine is still subject to the discretion of the court if there are significant issues of public concern that have not been addressed by the courts.

*1291 Although the prior case was brought by "taxpayers," they were individual taxpayers who were not charged with the duty to represent all the taxpayers of the County (in contrast with the taxpayers in this suit). In addition, the issue rasied there is a constitutional one in a case of significant public importance and should be considered by the court.
CP at 1097 (Decision on King County's Motion for Summary Judgment and Defendants' Cross-Motion at 2 (Feb. 24, 1997)).
Since res judicata requires an identity of parties, even if all other elements of the doctrine were present, at most only the claims of Scannell and Ruano might be barred.[14] However, this is a class action involving well over one million defendants mandating that the rights of each and every individual be respected and jealously guarded by the courts. In short, neither claim nor issue preclusion applies, and whether Ruano and/or Scannell "had their day in court" is no reason to abrogate the legal rights of countless registered voters, not all of whom are even described within the class of taxpayers.
Ordinance 12000 is ineffective until approved by the voters and Ordinance 12593 (which issued the bonds) is invalid absent an affirmative vote in that election. But there will be no election because the county unlawfully prevented it, and this court will not defend the legal rights of the citizens to hold one.

Conclusion
I conclude with reference to the memorandum decision of the trial court. CP at 1078-1088. The trial court basically recognized the facts as posited by the Taxpayers would "at least" establish that the profit-sharing provision "will in fact result in little or no financial return to the County and Taxpayers"; annual rent of $700,000 "is very low compared to ordinary expectations of market rates for rental property or return on investment" and constitutes an annual rate of return in the neighborhood of 0.2 percent; and the oversight functions of the PFD in managing the stadium may be very difficult to carry out. But in so doing, the trial court found the "adequacy of consideration" irrelevant because it was not necessary to submit this project to a "traditional market analysis." That is error. Such is the only method to determine whether the return to the taxpayers is adequate or grossly inadequate.
The bottom line of the trial court opinion is this: "The constitution does not exist to protect the public from the weaknesses or failings of their public officials." CP at 1086. It is ultimately upon that false proposition that the trial court and the majority of this court rest their case. But this dissent submits the constitution was ratified precisely to protect the public purse by "protect[ing] the public from the weaknesses or failings of their public officials." It was enacted to protect the public from the misdeeds of public officials who squander the wealth of the hardworking citizens of this state. That is the reason we have this constitutional article, if we can keep it.
For these reasons I dissent.
MADSEN, J., concurs.
NOTES
[*] Editor's Note: This opinion was originally published at 938 P.2d 309. It is published here as amended.
[1] The Court rejected numerous constitutional challenges to the Stadium Act in CLEAN v. State, 130 Wash.2d 782, 928 P.2d 1054 (1996).
[2] RCW 82.14.0485(2) states specifically that the special stadium sales and use tax of .01.7 percent "shall be deducted" from the amount of the statewide sales and use tax. Section 3(B) of Ordinance 12000 also states:

The tax imposed under this section shall be deducted from the amount of tax otherwise required to be collected or paid over to the department of revenue under chapter 82.08 or 82.12 RCW.
Clerk's Papers at 28.
[3] The Court rejected challenges to Ordinance 12000 in Citizens for More Important Things v. King County, 131 Wash.2d 411, 932 P.2d 135 (1997).
[4] The King County charter requires the Council to consider the proposed initiative. If the Council does not enact the ordinance within 90 days after presentation of petitions, the proposal "shall be placed on the ballot at the next regular or special election occurring more than one hundred thirty-five days after the petitions are filed or at an earlier election designated by the county council." Clerk's Papers at 624. Counsel for the County informed the Court at oral argument the County has yet to act on the initiative.
[5] A handful of states have statutes like Washington's providing a procedure for bond validation. See ALA.CODE § 11-81-220 et seq. (1994); CAL.CIV. PROC.CODE §§ 860-871 (West 1980); FLA. STAT. ANN. § 75.01 et seq. (West 1987); GA.CODE ANN. § 50-17-25 (1994); LA.REV.STAT. ANN. § 13:5121 et seq. (West 1991); MISS.CODE ANN. § 31-15-5 et seq. (1972); OHIO REV.CODE ANN. § 133.07 et seq. (Anderson 1994); W. VA.CODE § 13-1-25 et seq. (1995). See 3 M. DAVID GELFAND, STATE & LOCAL GOVERNMENT DEBT FINANCING § 11:45, at 107 n. 1 (1994).
[6] City of Spokane v. Taxpayers of City of Spokane, 111 Wash.2d 91, 758 P.2d 480 (1988); King County v. Taxpayers of King County, 104 Wash.2d 1, 700 P.2d 1143 (1985); Port of Longview v. Taxpayers of Port of Longview, 84 Wash.2d 475, 85 Wash.2d 216, 527 P.2d 263 (1974); Pierce County v. Taxpayers of Lakes Dist. Recreation Service Area, 70 Wash.2d 375, 423 P.2d 67 (1967); City of Tacoma v. Taxpayers of Tacoma, 60 Wash.2d 66, 371 P.2d 938 (1962); Port of Tacoma v. Taxpayers of Port of Tacoma, 53 Wash.2d 734, 336 P.2d 872 (1959); Shoreline Sch. Dist. No. 412 v. Taxpayers of Shoreline Sch. Dist. No. 412, 52 Wash.2d 849, 329 P.2d 829 (1958); City of Tacoma v. Taxpayers of Tacoma, 49 Wash.2d 781, 307 P.2d 567 (1957).
[7] The two sections provide:

§ 5 Credit Not To Be Loaned. The credit of the state shall not, in any manner be given or loaned to, or in aid of, any individual, association, company or corporation.
§ 7 Credit Not To Be Loaned. No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the poor and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation.
[8] It is appropriate to resolve these issues in the present RCW 7.25 suit, because if a court were later to sustain any of the constitutional questions the Taxpayers raise now, and declare the bonds invalid, default might occur. It is precisely the purpose of RCW 7.25 to resolve for all time any questions about the legality of the subject bonds.
[9] In any event, a delegation of legislative authority to an agency, subject to appropriate standards, is permissible. Barry & Barry, Inc. v. State, 81 Wash.2d 155, 159, 500 P.2d 540 (1972). The delegation here was subject to appropriate standards.
[10] The Taxpayers argue the question is not yet justiciable, but offer no argument contrary to the trial court's conclusion that Initiative 16 conflicts with state law. "Giving an opinion on the legal consequences of the Initiative 16 ordinance if and when adopted would be an advisory opinion (presumably for the benefit of bond counsel) and contrary to law." Br. of Appellants at 40. But the underlying purpose of a RCW 7.25 suit is to resolve all legal questions about the validity of the proposed bond. If the Court does not decide the Initiative 16 question now, further legal controversy regarding the validity of the bonds would likely ensue. RCW 7.25 is designed to resolve such controversy in a single action. Because Initiative 16 has the potential to invalidate the bond issue here, the initiative's effect is ripe for decision under RCW 7.25.
[11] The Taxpayers do not dispute the declaration of the Director of the Office of Budget and Strategic Planning for King County: "Issuance of limited tax general obligation bonds in an amount of $336,000,000 would not exceed the statutory provisions (RCW 39.36.020(a)(2)(ii)[sic]) which allows counties to incur debt up to 1.5% of the value of the taxable property within the county without a vote of the people." Clerk's Papers at 427.
[12] Although the present case involves an ordinance and not a charter provision, the principle of state law supremacy is the same.
[13] An additional basis for this viewpoint is that the Stadium Act mandates County issuance of the bonds once the County decided to proceed with a new baseball stadium, and declared this policy in Ordinance 12000. The trial court held, as a result, Initiative 16 cannot countermand state law. RCW 82.14.360(3) provides, in pertinent part:

The revenue from the taxes imposed under this section shall be used for the purpose of principal and interest payments on bonds, issued by the county, to acquire, construct, own, remodel, maintain, equip, reequip, repair, and operate a baseball stadium.... The county shall issue bonds, in an amount determined to be necessary by the public facilities district, for the district to acquire, construct, own, and equip the baseball stadium. The county shall have no obligation to issue bonds in an amount greater than that which would be supported by the tax revenues under this section, section 101 of this act, and RCW 36.38.010(3)(a) and (b).
(Emphasis added.) Once the County opted into the comprehensive financing plan for the baseball stadium by enacting Ordinance 12000 and imposing taxes under the Stadium Act, state law required the County to issue the bonds.
[14] The intervenors' arguments regarding a referendum on the issuance of the bonds fail for essentially the same reasons as the arguments on Initiative 16. The intervenors filed a referendum petition proposing that Ordinance 12593 (authorizing issuance of the bonds) be put to a public vote. The referendum cannot affect Ordinance 12593 for the same reasons Initiative 16 cannot affect the ordinance. However, the intervenors also apparently attempted to file a referendum with respect to Ordinance 12000. The trial court discussed this effort, stating:

Intervenors Scannell et al. suggest that Ordinance 12000 is subject to referendum; however, if that ordinance could have been presented to the people[,] the time has passed for so doing. It has been well over a year since the request for referendum on Ordinance 12000 was made. There is pending no action to require the County to send that Ordinance to the people. The time to pursue that issue was in 1995 and it cannot be revived indirectly now through a challenge to the bonds to be issued to implement policy decisions made in Ordinance 12000.
Clerk's Papers at 1105.
Ordinance 12000 was enacted on October 25, 1995. This ordinance represented King County's policy decision to proceed with the new stadium. Intervenors Scannell and Ruano apparently filed with the Metropolitan King County Council clerk's office a petition for referendum regarding Ordinance 12000 (that document is not in the Clerk's Papers). By letter to Scannell and Ruano dated October 27, 1995, the clerk ruled the ordinance was not subject to referendum and refused to process the petition. Clerk's Papers at 976. As noted above, the King County trial court stated there is no action pending in King County challenging the clerk's refusal and requiring the county to refer to Ordinance 12000 to the people. Nor have Intervenors Ruano and Scannell brought the existence of any such action to the Court's attention. Laches now prevents subjecting Ordinance 12000 to a referendum. Lopp v. Peninsula Sch. Dist., 90 Wash.2d 754, 585 P.2d 801 (1978) (suit to enjoin sale of bonds barred by laches because unreasonable delay in bringing suit resulted in changed conditions that would damage defendant if injunction allowed).
Scannell and Ruano have had their day in court as to the validity of Ordinance 12000. They challenged the validity of Ordinance 12000 in a Petition for Writ of Mandamus and Complaint for Declaratory Judgment, which they filed in Thurston County on December 27, 1995. In that suit, Ruano and Scannell alleged King County was "without authority to pass [Ordinance 12000]," and asked the trial court for a judgment declaring Ordinance 12000 "null and void." Clerk's Papers at 898. The trial court dismissed all their claims and this Court accepted direct review, ultimately affirming the dismissal in CLEAN v. State, 130 Wash.2d 782, 928 P.2d 1054 (1996).
[1] The 1996 population of King County was 1,628,800. 1996 Population Trends, Table 4, Office of Fiscal Management, State of Washington (Oct.1996).
[2] CR 56(f) provides:

(f) When Affidavits Are Unavailable. Should it appear from the affidavits of a party opposing the motion that he cannot, for reasons stated, present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.
A trial court refusal to permit time for discovery is reviewed under the abuse of discretion standard. Discretion is abused when the trial court does not allow the nonmoving party adequate opportunity to acquire discovery which could raise a material factual issue. Tellevik v. Real Property Known as 31641 West Rutherford Street, 120 Wash.2d 68, 91, 838 P.2d 111 (1992).
[3] The peppercorn is the classic example of "consideration given" that does not match the value received and thus represents nominal payment. Under English law a peppercorn was the stated rent in many nominal lease contracts. Black's Law Dictionary 1135 (6th ed.1990) (peppercorn is "the reservation of a merely nominal rent, on a lease"); 2 William Blackstone, Commentaries on the Laws of England 440 (1766) (referring to the practice of requiring payment of a peppercorn for a leasehold as nominal rent).
[4] 3 Samuel Williston, A Treatise on the Law of Contracts § 7:2, at 22 (Richard A. Lord ed., 4th ed.1992).
[5] See 2 William Blackstone, Commentaries on the Laws of England 440 (1766) ("in case of leases, always reserving a rent, though it be but a peppercorn [such] consideration will, in the eyes of the law, convert the gift ... into a contract."); State v. Teller Native Corp., 904 P.2d 847, 850 (Alaska 1995) ($10 nominal rent paid under the lease is legally sufficient consideration); Moses Lake Homes, Inc. v. Grant County, 51 Wash.2d 285, 286, 317 P.2d 1069 (1957) (construing valid lease of "one hundred thirty-eight acres leased from the Federal government for seventy-five years, at a nominal rental of one hundred dollars a year or about two cents per unit per month."). See also Matter of Estate of Little, 106 Wash.2d 269, 286-87, 721 P.2d 950 (1986) ($10 paid for a $1 million property may be legally sufficient consideration to uphold the sales contract).
[6] Although evidence of both, donative intent and grossly inadequate return, is present in this record, I beg to differ with the majority's initial formulation of the rule that "a transfer of property without consideration and with donative intent" is required (citing General Tel. Co. v. City of Bothell, 105 Wash.2d 579, 588, 716 P.2d 879 (1986)). Majority at 1267 (emphasis added). Although General Telephone did say just that, its use of the term "and" was a loose one corrected by more recent cases which properly replaced "and" with "or." Adams, 106 Wash.2d at 327, 722 P.2d 74; City of Tacoma v. Taxpayers, 108 Wash.2d at 703, 743 P.2d 793. Moreover, the majority recognizes that the discussion in CLEAN "is essentially the test for an unconstitutional gift of public funds we have articulated in numerous cases"; i.e., it is no departure from the Adams rule. Majority at 1266.
[7] See also Brigade v. Economic Dev. Bd., 61 Wash.App. 615, 621, 811 P.2d 697 (1991) (whether or not the county had donative intent plainly rested upon underlying material facts. CR 56(c) requires the moving party to "show there is no genuine issue as to any material fact."). Lewis v. Estate of Lewis, 45 Wash.App. 387, 392, 725 P.2d 644 (1986) (record supported finding existence of donative intent with respect to mother's transfer of real property to son); Matter of Estate of Little, 106 Wash.2d 269, 288, 721 P.2d 950 (1986) ("The existence or absence of a donative intent is a factual issue to be resolved by the trier of the fact."); Bellevue v. State, 92 Wash.2d 717, 721, 600 P.2d 1268 (1979) (donative intent is to be determined upon the evidence); Matter of Hoffman's Estate, 15 Wash.App. 307, 312, 548 P.2d 1101 (1975) (evidentiary finding on donative intent necessary at trial court), review denied, 87 Wash.2d 1007 (1976); Buckerfield's Ltd. v. B.C. Goose & Duck Farm, Ltd., 9 Wash.App. 220, 223, 511 P.2d 1360 (1973) (the presence or absence of donative intent is a question of fact for the trier of fact); Oman v. Yates, 70 Wash.2d 181, 182-83, 422 P.2d 489 (1967) (same); In re McDonald's Estate, 60 Wash.2d 452, 456, 374 P.2d 365 (1962) (Whether or not there is donative intent is a question for the trier of fact to be inferred from the evidence.).
[8] Where are the profits to share?
[9] For example, a home which is sold for substantially less than its fair market value is sold for a purchase price which is "grossly inadequate." Casa del Rey v. Hart, 110 Wash.2d 65, 72, 750 P.2d 261 (1988). An award of five percent of the sale price of windows plus $50,000 bond is "grossly inadequate." Boeing v. Sierracin Corp., 108 Wash.2d 38, 64 n. 4, 738 P.2d 665 (1987). Gross inadequacy is a relative concept measured against the value transferred. Buckerfield's Ltd., 9 Wash.App. at 226, 511 P.2d 1360. The sale of timber property worth $94,000 for $35,000 is "grossly inadequate." Zucker v. Mitchell, 62 Wash.2d 819, 822, 384 P.2d 815 (1963). Competitive bidding furnishes protection to the seller "and avoids the sacrifice of the property at a grossly inadequate sale price." Lee v. Barnes, 61 Wash.2d 581, 585, 379 P.2d 362 (1963). Damages of $6,800 were "grossly inadequate" when the evidence in the case would have sustained a verdict considerably more than that. Rathke v. Roberts, 33 Wash.2d 858, 881, 207 P.2d 716 (1949). Return of a property's fair market value is adequate, not "grossly inadequate." Washington State Hop Producers v. Riel, 20 Wash.2d 624, 627, 148 P.2d 847 (1944). Where it would cost $750 to construct roadway approaches, and the respondent only receives $600, compensation is "grossly inadequate." Downing v. State, 9 Wash.2d 685, 687, 115 P.2d 972 (1941). Whether or not a personal injury verdict is "grossly inadequate" depends upon the injuries and the pecuniary loss. Silow v. Mau, 186 Wash. 258, 260, 57 P.2d 1059 (1936). If the amount bid is fair under the circumstances, and there is no reasonable probability that a greater amount could be obtained on resale, the sale should be confirmed because the price was not "grossly inadequate." Blair v. Hewitt, 185 Wash. 430, 432, 55 P.2d 607 (1936). A transaction which is not "fair and just" is grossly inadequate. In re Madden's Estate, 176 Wash. 51, 58, 28 P.2d 280 (1934). Where the consideration paid is not fairly proportioned to the value of the property, the consideration is "grossly inadequate." Cannon v. Seattle Title Trust Co., 142 Wash. 213, 219, 252 P. 699 (1927). A sale of corporate property for a grossly inadequate price should never be permitted over the protest of minority stockholders. Cardiff v. Johnson, 126 Wash. 454, 463, 218 P. 269 (1923).
[10] See Rainier Nat'l Bank v. Inland Mach. Co., 29 Wash.App. 725, 732, 631 P.2d 389 (1981) ("Consideration may be `nominal' either in the absolute sense, e.g., $1 or relative to the value of the machine. For example, consideration of $1,000 for a machine worth $10,000 would be nominal.").
[11] The drafters explicitly rejected the idea that we can consider the intangible benefits resulting from subsidization of private business. Johnson v. Johnson, 96 Wash.2d 255, 266, 634 P.2d 877 (1981). Case law has similarly rejected such arguments. See State ex rel. O'Connell v. Port of Seattle, 65 Wash.2d 801, 806, 399 P.2d 623 (1965) ("The trial court was much impressed by the argument pressed by the respondents and the intervenors, that the denial of the right to engage in promotional hosting would result in the loss of business for the port. However, such a consideration does not justify the courts in disregarding the plain and unambiguous provisions of the constitution. If Article 8, § 7, is too restrictive in its terms, that is a matter for the citizens of this state to correct through the amendatory process."). However, in any event there will be no additional economic value to the Mariners' presence in the community. See Declaration of Professor Allan Sanderson. CP at 721.
[12] "[T]he underlying purpose of a RCW 7.25 suit is to resolve all legal questions about the validity of the proposed bond." Majority at 1285 n.10 (emphasis added).
[13] The record before us contains only the "Petition for Writ of Mandamus and Complaint for Declaratory Relief," omitting any pleading which shows the disposition of that action.
[14] "In Washington res judicata occurs when a prior judgment has a concurrence of identity in four respects with a subsequent action. There must be identity of (1) subject matter; (2) cause of action; (3) persons and parties; and (4) the quality of the persons for or against whom the claim is made." Mellor v. Chamberlin, 100 Wash.2d 643, 645, 673 P.2d 610 (1983).